UNITED STATES of America, Appellee,

v.

Giuseppe PUGLIESE and Pietro Pugliese, Defendants-Appellants.

Nos. 1181, 1182, Dockets 85–1460, 85–1461.

United States Court of Appeals, Second Circuit.

Argued May 13, 1986.

Decided Nov. 21, 1986.

Ivan S. Fisher, New York City (Alan Scribner, New York City, of counsel), for defendants-appellants.

Ephraim Savitt, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Reena Raggi, U.S. Atty., Allyne Ross, Asst. U.S. Atty., E.D. N.Y., of counsel), for appellee.

Before LUMBARD, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

These appeals from judgments imposing in each case 30-year terms of imprisonment question whether the sentencing court's consideration of testimony regarding Pietro Pugliese at a sentencing proceeding before another judge comports with due process. Recognizing the long held necessity for a sentencing court to have vast discretion in order to individualize punishment, the Supreme Court, in *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), cautioned lower courts not to treat the due process clause as a reason to abandon the widely accepted practice of considering out-of-court material, generally contained in a probation report, in order to reach a just sentence. *Id.* at 250–51, 69 S.Ct. at 1084–85. Yet, the Supreme Court has also stated that due process concerns are implicated at sentencing. *See Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948). Because these divergent views as to where the emphasis should be placed when imposing a sentence make the footing unsure, one cannot tread too confidently in this area of the law. Yet, we must decide whether the district court here heeded the admonishment of *Williams*, without foregoing the due process rights noted in *Townsend*.

## I BACKGROUND

### A. *Facts*

Pietro and Giuseppe Pugliese appeal from the sentences imposed in a judgment of the United States District Court for the Eastern District of New York (Bramwell, J.), following a jury trial at which both were found guilty of having violated 18 U.S.C. §§ 2, 371, 472, and 473 through their participation in a large-scale organized conspiracy to counterfeit fifty dollar bills. Pietro Pugliese was also convicted of aiding and abetting another sale of counterfeit money in violation of 18 U.S.C. §§ 472, 473. Based on these convictions, the district court sentenced each appellant to identical cumulative 30-year terms of imprisonment. In addition, both appellants were fined $20,000 and Pietro Pugliese was given a

concurrent 10–year term on his separate conviction.

Appellants were first indicted in February 1982. When the government was unable to proceed to trial because its principal witness refused to testify, Judge Bramwell denied a motion for a continuance and dismissed the indictment under Fed.R.Crim.P. Rule 48(a), stating:

> I will tell you one thing, I have a great deal of resentment for people like these who are foreigners and come here and are involved in crime. I did this thing because this is what the situation called for. But these people are foreigners who come here and are involved in crime and they think we are supposed to give them special consideration. This type of people [sic] are the worst things we have and I am telling you that for you to tell it to each of the defendants.

On April 2, 1985, after the appellants were reindicted, a motion for the trial judge to recuse himself based on the above statements was denied. The case then proceeded to trial on October 3, 1985 and resulted in guilty verdicts. Judge Bramwell sentenced the Puglieses on December 3, 1985.

During the sentencing proceedings the district court judge said that he would consider allegations that appellants had sanctioned an attempt to murder an adverse federal witness. In considering these allegations the sentencing court further stated that it would review the transcript of a hearing being held before another district court judge pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir.1978) (*Fatico I*). Appellants assert that the sentencing proceedings violated their rights to due process and that the sentencing judge should have recused himself based upon his pretrial remarks.

### B. *Sentencing Hearings*

We examine first the facts relevant to the due process challenge. Both Puglieses' presentence reports contained identical allegations that appellants were involved in an attempted murder of a government witness who was shot while enroute to the courthouse to testify against them. When defense counsel questioned the propriety of the sentencing judge considering this information, the following colloquy took place on November 14, 1985 at the first of two sentencing hearings held before Judge Bramwell.

THE COURT: You know, I would say this to you as to the shooting of Mr. Quagliata at the time the witness was on his way to Court, he was driving and I can't say that either of these two defendants actually did the shooting or anything of that nature, that, I can't say but in some way, this Court must believe that these defendants are somehow involved in this, the Court must believe that. Of course, it would be—other than that, it would be utterly ridiculous, the Court must believe that.

MR. FISHER [DEFENSE]: Well, your Honor, in that regard, first, as I understand it, the government does not even allege the involvement in anyway at all by Pietro Pugliese in that incident, that's the first thing.

THE COURT: Let me say this to you, the history of what has happened with this case would almost dictate to this Court that these defendants were involved in some way in that shooting and I'm standing on that statement, I'm not going to change it.

MR. FISHER: Your Honor, the defendants, each of them deny [sic] categorically any involvement whatsoever in the shooting.

THE COURT: I will let you say that as long as you want to stand there and as long as you want to say it and I will listen to you but my statement, I stand by it and it's not going to change.

The history mentioned by the sentencing judge refers to the disappearance and intimidation of prior witnesses. Specifically, one government witness who disappeared in violation of his bail conditions stated when he was apprehended that the Puglieses had told him to flee and had financed his flight. Later, this same witness was again asked to cooperate with the prosecution. While awaiting an interview with an Assist-

ant United States Attorney (AUSA), he was detained in the same facility as Giuseppe Pugliese. Ultimately, he declined to testify. A second government witness also refused to testify. Threats—recounted more fully below—were also made against the witness who was actually shot.

The summarized history was relied upon and read into the record at the behest of the trial court. Shortly afterwards, this colloquy ensued.

> THE COURT: The history of this case lends itself to any reasonable person to believe that these defendants were part of what happened to Vincenzo Quagliata.
>
> DEFENSE: Your Honor, I appreciate the candor of the Court in telling me as you have where you are at with regard to these considerations.
>
> THE COURT: This is something, this I will say without hesitation is something I rarely do on a sentence but in this situation, I'm almost compelled to accept what has happened here as against these two defendants.

The district judge then learned that Judge Wexler of the Eastern District was conducting a *Fatico* hearing regarding Giuseppe's participation in the attempted assassination. Judge Bramwell expressed an interest in the records of that proceeding,

even offering to look at them, though the court still maintained that "[t]he record will be ample and I will still take the same position, in some way these defendants are involved...." The hearing concluded with the district judge stating that his "position has not changed, it's going to be the same up to the sentence, through the sentence, it's not changing."

Judge Bramwell conducted a second sentencing hearing on December 3, 1985. Initially he read a prepared text representing his findings as to appellants' involvement in the shooting.[1] Testimony adduced at Judge Wexler's *Fatico* hearing, which Judge Bramwell had requested to see on his own motion, corroborated the circumstantial evidence of intimidation of other witnesses. Judge Bramwell summarized his view of these matters as follows:

> In short, the overwhelming circumstantial evidence in this matter, coupled with testimony offered during Judge Wexler's hearing, compelled this Court to find that Giuseppe Pugliese and Pietro Pugliese were in some way responsible for the intimidation and attempted murder of the witness Vincenzo Quagliata. For this Court to ignore the evidence connecting the Puglieses with the shooting of Quagliata would be to turn a blind

---

1. THE COURT: Before we proceed, the Court is going to put a statement on the record.

In light of defense counsel's concern about the extent of this Court's belief that the defendants were involved with the shooting of Vincenzo Quagliata the Court will put the following statement on the record.

To begin with, there is ample circumstantial evidence supporting the finding that the Pugliese brothers were in some way connected with the intimidation and shooting of Quagliata.

This case against the Pugliese brothers has had a disturbing history of witnesses mysteriously disappearing, often literally on the eve[ ] of trial, allegedly at the command of the Puglieses.

The mere fact that, after other government witnesses had become unavailable under suspicious circumstances, the witness Quagliata was shot on the way to Court for a meeting with Assistant U.S. Attorney Savitt, would by itself lead this Court to reject the contention that the defendants were not at all responsible.

This circumstantial evidence, moreover, is directly supported by testimonial evidence elicited at a presentence hearing conducted by Judge Wexler in August of this year.

At that hearing, for example, detective Alphonse Ripandelli of the New York City Police Department testified that one Carmello Lovacco, who admitted to being the driver of the vehicle from which the shots were fired at Quagliata, stated that Quagliata was to be shot at the behest of Joe [Giuseppe] Pugliese because Quagliata "was a rat."

Detective Ripandelli further testified to information that Lovacco performed this criminal act to obtain status in the criminal organization run by Joe Pugliese.

Special Agent Jerry Williams of the United States Secret Service also testified at the hearing. Agent Williams testified that approximately one week before Quagliata was shot in the head, another associate of Joe Pugliese accosted Quagliata with a warning that if he, Quagliata, testified against Joe or Pete [Pietro] Pugliese that he would, "lose his head."

eye to reality, and would be in gross dereliction of this Court's duty to see that justice is done in this courtroom. Because the district court's ultimate findings, made after it had examined the *Fatico* material, were substantively identical to its preliminary statement, defense counsel questioned whether Judge Bramwell's findings were fair and objective.

Appellants were sentenced during this second hearing. The district court's conclusion that the Puglieses had participated in the shooting plainly influenced it as to the sentences imposed. For example, in sentencing Giuseppe Pugliese, the court noted that appellant "intimidated, threatened and tried to have murdered a witness against him." The attempt was mentioned again when Pietro Pugliese was sentenced. "The Pugliese brothers tried to hinder and prevent their prosecution again in 1985 by attempting to have murdered another primary witness against them, fortunately he survived and is recovering."

C. *The* Fatico *Hearing*

We turn now to Judge Wexler's *Fatico* hearing upon which Judge Bramwell relied. Judge Wexler conducted four separate hearings. The first three hearings occurred prior to the first sentencing hearing before Judge Bramwell and were considered by him at the second sentencing hearing of December 3, 1985. The fourth and last *Fatico* hearing held by Judge Wexler took place after Judge Bramwell had sentenced appellants.

During the first *Fatico* hearing, the AUSA stated that Quagliata was shot shortly after his status as a witness was made known to the defense. A detective testified that his informant had a conversation with the driver of the vehicle used during the murder attempt. In the conversation, the driver admitted that the shooting had been planned because Quagliata was going to testify against Giuseppe Pugliese and that the driver undertook the mission for the purpose of "obtain[ing] status in the organization run by Giuseppe Pugliese." When Judge Wexler became aware that tapes existed of the conversation between the informer and Lovacco (the

driver) he ordered them produced for his *in camera* inspection. A Secret Service agent also testified to a conversation that he had with Quagliata in which Quagliata told him that approximately a week prior to the shooting, he was approached by an individual named Tony whom he had known for approximately five years and who worked for Giuseppe Pugliese. The agent testified that Quagliata had also said that "Tony came up to him by himself" and threatened " 'if you testify against Joe or Peter you're going to lose your head.' " Defense counsel was given ample opportunity to cross-examine the detective and the Secret Service agent.

Judge Wexler found at the second hearing held the next day that the tapes corroborated the detective's testimony of the previous day and stated: "I will go one step further, I find nothing inconsistent." Up until this point in the hearings all of the allegations of involvement in the shooting referred to both appellants. Significantly, for the first time the government admitted at the third hearing that only Giuseppe Pugliese was implicated in the shooting and that "there is no statement that Pietro Pugliese was involved in it".

At the final *Fatico* hearing, held January 31, 1986, Judge Wexler refused to consider Giuseppe Pugliese's alleged participation in the attack on Quagliata. Neither counsel objected to this ruling as they had agreed among themselves that the murder attempt allegations had already influenced the sentencing decision of Judge Bramwell who had sentenced the Puglieses earlier on December 3, 1985 (without the benefit therefore of the January 31 hearing and decision).

II  DISCUSSION

Appellants contend that it violates due process for the sentencing judge to examine the transcript of an ongoing *Fatico* hearing before another judge involving only one appellant, and then use the evidence there revealed in sentencing both appellants. The Puglieses additionally urge that the Court's statements during

sentencing demonstrate that it was already firmly convinced of their connection to the murder attempt, and that therefore it refused to conduct a full hearing on this point. The government responds that the Puglieses had an adequate opportunity to challenge the allegations regarding their involvement in the Quagliata shooting at the hearing conducted by Judge Wexler on those identical claims.

### A. *Due Process at Sentencing*

Historically, sentences were rigidly imposed. Blackstone relates how those felonies to which the benefit of clergy extended were all punishable by death, 4 W. Blackstone, *Commentaries* 94 (Univ. of Chicago Press ed. (1979)), giving no option to the sentencing court upon conviction except that of imposing the fixed sentence. Discretion crept in gradually. Presently, sentencing is a highly subjective exercise of judgment—seldom successfully challenged—because a sentence imposed by a district court within statutory limits, and not illegal, or based on inaccurate information, or procedures that offend due process will not be interfered with on appeal. *United States v. Slocum*, 695 F.2d 650, 657 (2d Cir.1982), *cert. denied*, 460 U.S. 1015, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983).

■ Moreover, a district court judge's discretion in sentencing is "largely unlimited either as to the kind of information he may consider, or the source from which it may come." *See United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). We have consistently acknowledged a sentencing court's wide discretion to consider all circumstances that shed light on a convicted person's background, history and behavior. *Billiteri v. United States Bd. of Parole*, 541 F.2d 938, 944 (2d Cir.1976); *see also United States v. Charmer Industries, Inc.*, 711 F.2d 1164, 1170–71 (2d Cir.1983) (hearsay statements bearing no relationship to the crime charged may be included); *United States v. Mennuti*, 679 F.2d 1032, 1037 (2d Cir.1982) (similar though uncharged crimes may be considered); *United States v. Hendrix*, 505 F.2d 1233, 1235 (2d Cir.1974), *cert. denied*, 423 U.S. 897, 96 S.Ct. 199, 46 L.Ed.2d 130 (1975) (claimed perjury, though neither charged nor tried, may be taken into account); *United States v. Needles*, 472 F.2d 652, 654–56 (2d Cir.1973) (a dropped count in an indictment may be considered); *United States v. Sweig*, 454 F.2d 181, 184 (2d Cir.1972) (criminal activity for which a defendant has been acquitted may be included).

■ Sentencing is nonetheless a critical stage in a criminal case where due process protects a convicted person as it does an accused at trial. A convicted defendant has a right to procedural safeguards, such as the right to counsel, *see Mempa v. Rhay*, 389 U.S. 128, 134, 88 S.Ct. 254, 256, 19 L.Ed.2d 336 (1967). As a consequence, sentencing no longer stands like an island separate from the mainland of criminal law.

■ Further, the Supreme Court instructs us that a defendant has a due process right to question the procedure leading to the imposition of his sentence. *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977). What process is due at sentencing must be evaluated in light of four factors: (1) the nature of the individual interest, (2) the risk of error inherent in present methods of obtaining information, (3) the value of additional procedural safeguards, and (4) the government's interest, including fiscal burdens, of any proposed additional safeguards. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ We apply these factors to the facts in the instant case, testing whether Judge Bramwell's use of the *Fatico* hearing before Judge Wexler violated procedural due process. Obviously the interest of an offender at sentencing could not be greater because his sentence in large measure determines that individual's future destiny. Yet, when a sentencing judge reads the transcript of another judicial proceeding where the defendant has had the opportunity to cross-examine witnesses, the risk of prejudice is minimal. Since the borrowed

hearing was used simply to corroborate certain statements contained in the Puglieses' presentence reports, additional procedural safeguards are not required. Nor is the government's interest affected by this method of obtaining information.

Beyond the application of the *Mathews v. Eldridge* factors, it is plain that to review the transcript of a judicial hearing is certainly no less trustworthy than the ordinary kinds of information found in a presentence report that a district judge reads and relies upon. *Hendrix*, 505 F.2d at 1235. Analyzing the method Judge Bramwell used against the four factors we conclude that, on balance, it may not be faulted on due process grounds, particularly when heeding the Supreme Court's lesson in *Williams* that sentencing courts should not abandon the practice of considering out-of-court sources of information. 337 U.S. at 246, 69 S.Ct. at 1082. Thus, we are satisfied that the wide discretion vested in a district court at sentencing permitted Judge Bramwell to consider the information developed at the hearing before Judge Wexler.

**B.** *No Requirement for Evidentiary Hearing*

■ Appellants nonetheless insist that they were entitled to a full-blown hearing in their challenge to the presentence reports. When hearsay is admitted into evidence through a presentence report and the defendant challenges the veracity of that evidence, the government must introduce corroborating proof. Corroboration is required to ensure "the reliability of evidence that is difficult to challenge ... through cross-examination or otherwise...." 579 F.2d at 713 (*Fatico I*). The cases suggest that corroboration may be provided simply by a government proffer, but leave silent how that proffer may be challenged.

Due process as well as Rule 32 requires that a defendant be allowed in some manner to challenge the prosecution's proffer to assure the reliability of presentence report information. The defendant may challenge the prosecution's affidavits, letters, and other submissions to the court; he may direct comment to the court, and may cross-examine witnesses. Both sides should have an effective opportunity to rebut allegations likely to affect the sentence, *see* 3 *Standards for Criminal Justice, Sentencing Alternatives and Procedures,* Standard 18–6.4 at 448 (1986 Supp.), including, for example, the right to examine sentencing material, and the right to challenge allegations in the presentence report. *See* Note, *Procedural Due Process at Judicial Sentencing for Felony,* 81 Harv.L.Rev. 821, 825 (1968).

■ But a convicted defendant has no absolute right to present his own witnesses, since sentencing proceedings are not designed to be full-blown evidentiary hearings, *Needles*, 472 F.2d at 657–58, or minitrials, because of the costly burden that would impose on the court. Sentencing hearings ultimately are conducted within the discretion of the district court. *Charmer Industries,* 711 F.2d at 1172. Under Fed.R.Crim.P. 32(c)(3)(A) a district court's options include affording a defendant, at the minimum, "an opportunity to comment on the report" and, in the district court's discretion, "to introduce testimony or other information relating to any alleged factual inaccuracy contained in it." The choice followed rests in the sound discretion of the sentencing court. Hence, it is clear that the Puglieses had no right to a mandatory evidentiary sentencing hearing.

**C.** *Requirement That Information on Which Sentence Based Be Reliable and Accurate*

■ Nevertheless, as *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), recognizes, due process requires that a convicted person not be sentenced on "materially untrue" assumptions or "misinformation." *Id.* at 741, 68 S.Ct. at 1255. In addition, Congress' interest in reliable sentencing information can be clearly discerned in the various amendments to Federal Rule of Criminal Procedure 32. In 1975, subdivision (c)(3)(A) was amended to allow a defendant *or* his or her counsel to review a presentence report to comment on it at sentencing to insure "that

the presentence report be completely accurate in every material respect." H.R.Rep. No. 247, 94th Cong., 1st Sess. 18, *reprinted in* 1975 U.S.Code Cong. & Ad.News 674, 690. More recently in 1983, subdivision (c)(3) was further amended to provide for disclosure of the report to *both* defendant *and* his counsel *without request*. See Fed. R.Crim.P. 32(c)(3)(A), 18 U.S.C. app. at 124 (Supp. III 1985). Moreover, subdivision (a)(1) was amended to impose on the sentencing court the obligation to determine "that the defendant and his counsel have had the opportunity to read and discuss the presentence investigation report made available pursuant to subdivision (c)(3)(A) or summary thereof made available pursuant to subdivision (c)(3)(B)." Fed.R.Crim.P. 32(a)(1)(A), 18 U.S.C. app. at 123 (Supp. III 1985).[2]

■■■ Consequently, a district court has an obligation to assure itself that the information upon which it relies in sentencing defendants is both reliable and accurate. In the instant case, the district court did not satisfy this Rule 32 obligation. Instead, it relied on the allegations of the presentence reports and its belief in the appellants' prior history of witness intimidation, and announced its "unalterable" conclusion that the Puglieses were implicated in the murder attempt. The district court made clear that regardless of what it might later learn, it would remain convinced that appellants participated "in some way" in the shooting. Expressions of a fixed view based on the presentence report made prior to a hearing are inconsistent with the due process obligations imposed on a sentencing court to consider only reliable and accurate information. As such, they call into question a sentencing judge's impartiality, and thus cast doubt on the fair and impartial administration of justice at a critical stage of a criminal proceeding. Even when subsequent evidence is produced in support of the district court's earlier statement, public confidence in the reliability of the sentencing procedure has been weakened.

The gathering of information contained in a presentence report is not an exact science, as this case illustrates. Because the information in a presentence report may be unfounded malicious gossip, inaccurate, or materially false, sentencing courts must tread warily, without acting blindly upon serious allegations, absent guarantees of reliability. The Puglieses' presentence reports before Judge Bramwell each contained the same Parole Guideline Worksheet which, under "Particularly Aggravating Factors," stated: "Witness Vincenzo Quagliata was shot and seriously wounded while on his way to federal court to provide testimony against the defendant on May 23, 1985." Of course, the government later conceded that it had no proof of Pietro Pugliese's involvement in that shooting. In our view, the district court's failure to ascertain the reliability and accuracy of the presentence reports constitutes plain error and is also an abuse of discretion that mandates vacatur of the sentences. Therefore, we remand the matter for resentencing before a different district court judge. *See United States v. Robin*, 545 F.2d 775, 778 (2d Cir.1976).

### D. *Resentencing*

Upon resentencing the court should adopt whatever method it believes will best insure the reliability and accuracy of the sentencing information. The resentencing we are now directing should not be regarded as an adjudication of appellants' claim that they were not involved in the shooting. Rather the district court may consider relevant evidence linking Giuseppe Pugliese with the murder attempt. Pietro Pugliese was not a defendant at the hearing before Judge Wexler, and the government admitted that it had no evidence linking him to the shooting. The evidence before Judge Wexler thus does not support the allegation that Pietro Pugliese participated in some manner in the shooting. The government must therefore produce other evidence, if such exists, to substantiate its

**2.** Congress subsequently amended subdivision (a)(1). None of the changes is relevant to our discussion. *See* Continuing Appropriations,

1985—Comprehensive Crime Control Act of 1984, Pub. 98–473, Title II, § 215(a), 98 Stat. 2014 (1984) (effective November 1, 1986).

claim that he was implicated in the murder attempt. Of course, in assuring the reliability of the presentence report the government is not held to a "beyond a reasonable doubt standard", *see United States v. Fatico,* 603 F.2d 1053, 1057 & n. 9 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980) (*Fatico II* ). *See also Williams,* 337 U.S. at 246–47, 69 S.Ct. at 1082–83.

## III  RECUSAL

Finally, appellants made a motion of recusal pursuant to 28 U.S.C. § 455(a) and the Fifth Amendment. This motion was based upon the statements made by the district court in its 1982 dismissal of the preceding indictment against the Puglieses. Section 455(a) requires recusal when the impartiality of the court is "reasonably" suspect. We have noted that 28 U.S.C. §§ 144 and 455 should be construed in *pari materia* and that the test is the same under both sections: "The determination should be made on the basis of conduct extrajudicial in nature as distinguished from conduct within a judicial context." *In re International Business Machines Corp.,* 618 F.2d 923, 928 (2d Cir.1980) (quoting *Davis v. Board of School Commissioners,* 517 F.2d 1044, 1052 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976)). "The rule of law, [for § 144 and therefore § 455(a) ], without belaboring the point, is that what a judge learns in his judicial capacity— whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both—is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification." *United States v. Bernstein,* 533 F.2d 775, 785 (2d Cir.1976).

The statement challenged here, though admittedly strong, is a product of the district court's observations and information derived from the pretrial proceedings. As such, it may not serve as a basis for a successful motion to recuse.

## IV  CONCLUSION

The case is remanded to another district court judge for resentencing consistent with this opinion.