UNITED STATES of America, Appellee,

v.

Sixto MESCAINE–PEREZ, Defendant–Appellant.

No. 553, Docket 87–1401.

United States Court of Appeals, Second Circuit.

Argued Dec. 17, 1987.

Decided May 31, 1988.

John Savarese, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Robert L. Plotz, Celia Goldwag Barenholtz, Asst. U.S. Attys., New York City, on the brief), for appellee.

Phylis Skloot Bamberger, New York City (The Legal Aid Soc. Federal Defender Services Unit, New York City, on the brief), for defendant-appellant.

Before TIMBERS, MESKILL and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Sixto Mescaine–Perez ("Mescaine") appeals from an order of the United States District Court for the Southern District of New York, John E. Sprizzo, *Judge*, denying his motion for a reduction of his sentence pursuant to Fed.R.Crim.P. 35. Mescaine was convicted after a jury trial before Judge Sprizzo on one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846 (1982), and one count of distributing and possessing with intent to distribute approximately 2.28 kilograms of cocaine, in violation of 21 U.S.C. §§ 812,

841(a)(1) and 841(b)(1)(B) (1982), and 18 U.S. C. § 2 (1982). Judge Sprizzo, stating that Mescaine was the leader of the conspiracy, sentenced Mescaine to concurrent terms of nine years' imprisonment, to be followed by a three-year term of special parole, and imposed an assessment of $100. In moving for a reduction of his sentence, Mescaine contended that the court's view of his role in the conspiracy was based on misinformation. The court denied the motion, stating that its view of Mescaine's role would have been the same even disregarding the challenged information. On appeal, Mescaine contends principally that the unimpeached trial evidence was insufficient to support the court's view. For the reasons below, we affirm the denial of the motion.

## I. BACKGROUND

Mescaine was indicted with Gerald Akhtar and three other defendants, Juan Bautista Ruiz Torres–Cabrero ("Torres"), Juan Ruiz–Garcia ("Garcia"), and Luis Ruiz–Rojas ("Rojas"), for distribution of and conspiracy to distribute cocaine, on the basis of events in January 1986 culminating in the sale of cocaine to undercover New York City Police Detective Ernest Blount. Akhtar and Torres pleaded guilty to the distribution charge; Garcia and Rojas were tried with Mescaine and all three were convicted of distribution and conspiracy. Mescaine's four codefendants were sentenced to, *inter alia,* prison terms ranging from time served (about three months) to seven years. As indicated above, Mescaine, viewed by the court as the leader of the group, was sentenced to concurrent prison terms of nine years. The government's evidence at trial was presented principally through the testimony of Blount and a surveillance officer, Police Detective Franklin Puello.

### A. *The Government's Evidence at Trial*

On January 8, 1986, Blount was introduced by a confidential informant to Akhtar, who sold Blount one-eighth of a kilogram of cocaine for $5,550. Akhtar told Blount he could supply larger quantities of cocaine for $40,000 per kilogram on a few hours' notice. Akhtar needed notice in order to determine whether his source had the requested quantity on hand.

On January 14, Akhtar informed Blount that his source had just returned from Miami with a fresh supply of cocaine, and they discussed a five-kilogram deal. The following afternoon, Akhtar and Blount met at 164th Street and Fort Washington Avenue in Manhattan. Advising Blount that the deal would be done in two stages, three kilograms that evening and two the next day, Akhtar sold Blount a one-ounce sample for $1,400.

On the evening of January 15, Blount returned, accompanied by an undercover partner. He and Akhtar entered the building at 106 Fort Washington Avenue and went to apartment 6M on the sixth floor, where they met Torres. Akhtar told Torres that "Frankie," who turned out to be Garcia, had said to wait for him there. Torres led Akhtar and Blount into a bedroom and closed the door. While they waited, Akhtar showed Blount a plastic bag containing a white powder residue and told him they had previously done deals in that room, including one the day before. After about five minutes, Blount said he needed to go to his car to reassure his partner, who was sitting there with $120,000. Akhtar and Blount went down to the street, and Blount got into his car. Akhtar, soon joined by Garcia, then informed Blount that the deal was being delayed because they were concerned about three men parked across the street in a bus stop (who were in fact Puello and two other surveillance agents); Garcia said they were going to "check [them] out" to be sure the area was safe.

Blount asked whether the cocaine was already in the area. Akhtar then pointed to a tan Ford, which had just parked behind the car carrying the surveillance agents, and said the cocaine was in the Ford. Blount and Puello observed a man, later identified as Mescaine, get out of the Ford and walk toward 106 Fort Washington Avenue; Garcia also walked toward the building. Akhtar told Blount he would page Blount's beeper when it was safe to return to the area, and Blount and his partner left.

Puello observed Mescaine speak to an unidentified person and then leave the area in the Ford. The surveillance agents then also left the area.

Blount and his partner returned about five minutes later, having received a signal from Akhtar. Akhtar and Blount again went to the sixth floor of 106 Fort Washington Avenue, where Torres met them and informed them that Garcia had not yet arrived. Akhtar went downstairs to find Garcia. In the meantime, when Puello returned to Fort Washington Avenue, he observed Rojas sitting in a parked blue Cadillac, looking around as if watching for a signal. Rojas soon got out of the Cadillac, carrying a plastic "I Love New York" shopping bag, and met Garcia; the two walked toward 106 Fort Washington Avenue. Rojas went into the building; when Akhtar returned to the sixth floor of the building, he was accompanied by Rojas and Mescaine.

Blount, Torres, and Rojas went into the bedroom of 6M, leaving Akhtar and Mescaine in the hallway. Blount inspected the contents of Rojas's shopping bag, which contained two one-kilogram packages of cocaine. When Blount asked about the third kilogram agreed on, Rojas said that a half-kilogram would be forthcoming when Blount made payment. Blount approved the cocaine, and he, Torres, and Rojas then rejoined Akhtar and Mescaine in the hallway. Blount was instructed to go down to his car; the cocaine would then be brought down, he would inspect it, and the cocaine and the money would be exchanged. Akhtar reassured Blount that the remaining half-kilo would be delivered when the money was paid.

Blount, Akhtar, and Mescaine then rode down in the elevator, leaving Torres, Rojas, and the cocaine behind. During the ride down, Akhtar introduced Mescaine as his "source of supply," saying that Mescaine was "where the kilos were coming from." Blount complained that he did not want to have to make the same trips up and down on the following day when the remaining kilograms were to be sold. Akhtar stated this would not be a problem, and Mescaine nodded and stated that the next day's transaction would be done downstairs at the car, from his hands to Blount's. Blount, who does not speak Spanish, testified that this conversation had taken place in English.

Blount and Akhtar went to Blount's car to await the cocaine; Mescaine accompanied them toward Blount's car, then walked to the corner and stood there. Akhtar pointed to Mescaine at the corner and repeated that Mescaine was "the source" and that he was not a flashy dresser, in order not to bring attention to himself.

Rojas soon exited the building, bringing the "I Love New York" bag to Blount. Mescaine then began walking away from the corner. Blount checked the bag and saw that it contained the original two one-kilogram packages and an additional clear plastic bag containing cocaine. Blount instructed his partner to pay $100,000, whereupon the partner gave a prearranged signal, and Akhtar, Torres, Rojas, and Garcia were arrested. Minutes later, as he tried to drive away in the tan Ford, Mescaine too was arrested.

The three packages delivered to Blount contained a total of 2.28 kilograms of cocaine. Its purity ranged from 85% to 87%.

### B. *Mescaine's Defense; The Verdict*

Mescaine took the stand in his own behalf and testified that Garcia had picked him up on the evening of January 15 to go to Garcia's house for a meal. They had stopped at 164th Street and Fort Washington Avenue because Garcia wanted to buy marijuana; Garcia got out of the car and Mescaine drove it around the block. In the course of this, police officers stopped the car and arrested Mescaine. Mescaine denied having gotten out of the car, denied ever entering 106 Fort Washington Avenue, and denied ever seeing or conversing with Blount.

Mescaine also testified that he could not speak English. He called as witnesses three Spanish-speaking, non-English-speaking acquaintances who testified that they had never heard Mescaine speak English.

The jury found Garcia, Rojas, and Mescaine guilty of conspiracy and distribution as charged.

## C. *The Sentences*

All five defendants were sentenced to prison terms and special parole terms and were ordered to pay special assessments. The principal sentencing variations occurred in the length of the prison terms.

Having accepted pleas of guilty from Akhtar and Torres, the district court sentenced Akhtar to a five-year term of imprisonment, with all but six months suspended, and sentenced Torres to imprisonment for the length of time he had already been detained, which was approximately three months. As to the defendants who went to trial, the court assessed the relative degrees of culpability as follows. Finding Rojas "somewhat less" culpable than the others, the court sentenced him to two concurrent five-year terms. Finding that Garcia was "more supervisorily involved," and thus, "more culpable" than Rojas, the court sentenced Garcia to two concurrent seven-year terms. Finding that Mescaine was "involved in a very substantial narcotics transaction, and I think, under the evidence as I observed it and heard it, at the higher level of this particular operation," the court sentenced Mescaine to two concurrent nine-year terms.

Mescaine, who moved unsuccessfully for a new trial, presenting affidavits of bilingual acquaintances who asserted that Mescaine did not speak English, urged the court to disregard the statements attributed to him by Blount and argued that the credible evidence did not show him to be a higher-up in the operation. In response, the court stated "I know what the jury found, I know what the evidence showed, and I have to assume that the evidence is as the government contends it to be, because that is what the jury found. And if the jury found that and accepted that, then he is numero uno in this limited operation."

Mescaine's conviction was affirmed by this Court in December 1986, after his assigned counsel on appeal filed a brief pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

## D. *Mescaine's Rule 35 Motion*

In April 1987, represented by newly assigned counsel, Mescaine timely moved for a reduction of sentence pursuant to Fed.R. Crim.P. 35(b) on the ground that the court's view of him as the source of the cocaine was erroneous. He contended that this view was based principally on Blount's testimony of the conversation in the elevator, which Blount, who does not speak Spanish, said was conducted in English. As evidence that he did not speak English, Mescaine offered (a) letters from acquaintances having contact with him both before and after his incarceration, (b) a report of a linguistics expert who had tested Mescaine and concluded that he could not speak or understand English sufficiently to have participated in or comprehended the conversation in the elevator, and (c) a polygraph report concluding that when Mescaine answered "no" to the question whether he had discussed a drug sale with Blount on January 15, 1986, he was telling the truth. Observing that the other evidence on which the court could have relied was Akhtar's statements that Mescaine was his source, Mescaine also proffered an affidavit from Theodore W. Kheel ("Kheel affidavit"), an attorney who stated that Akhtar's counsel had told him that Akhtar had said recently that Akhtar had not known Mescaine prior to their arrests on January 15; the Kheel affidavit opined, therefore, that if Akhtar made the statements testified to by Blount, Akhtar's statements themselves were hearsay and were inadmissible at trial.

Without holding an evidentiary hearing, the district court denied the Rule 35 motion, stating that even without Akhtar's statements that Mescaine was the source of the cocaine and without the statements attributed to Mescaine himself, the court was convinced that Mescaine was a principal in the cocaine transaction:

> [E]ven discounting the co-conspirator's statement and Blount's challenged testimony, the evidence establishing defendant's status as a principal violator is far

from minimal, especially when taken in connection with defendant's trial testimony which is both incredible and flatly inconsistent with what others observed on the night in question. The Court therefore finds that even discounting the challenged evidence, defendant's status as a principal violator is established by other evidence and that the sentence imposed is entirely justified.

Memorandum Opinion and Order, dated September 3, 1987, at 2.

Mescaine has appealed, pursuing his contentions that his sentence is based on misinformation.

## II. DISCUSSION

■ As it existed at the time of Mescaine's motion, Rule 35 of the Federal Rules of Criminal Procedure allowed the district court, within certain time limitations not at issue here, to, *inter alia*, "correct a sentence imposed in an illegal manner," Fed.R.Crim.P. 35(a), *amended by* Pub.L. No. 98–473, 98 Stat. 2015–16 (1984) (effective Nov. 1, 1987, Pub.L. No. 99–217, 99 Stat. 1728 (1985)). A sentence "imposed in an illegal manner," within the meaning of Rule 35(a), includes one that is within the statutory limits set by Congress but which violated the defendant's due process right not to be sentenced on the basis of inaccurate information. *E.g., United States v. Madonna*, 582 F.2d 704, 705 (2d Cir.1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 838, 59 L.Ed.2d 34 (1979); 8A *Moore's Federal Practice* ¶ 35.03[2], at 35–36.1 to 35–37 (2d ed. 1987); *see Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948) (defendant may not be sentenced on the basis of "materially untrue" statements or "misinformation"); *United States v. Romano*, 825 F.2d 725, 728 (2d Cir.1987).

■ In addition, Rule 35(b) allowed the court to reduce a valid sentence that had been imposed in a legal manner. Fed.R.Crim.P. 35(b), *amended by* Pub.L. No. 98–473, 98 Stat. 2016 (1984) (effective Nov. 1, 1987, Pub.L. 99–217, 99 Stat. 1728 (1985)) and Pub.L. 99–570, 100 Stat. 3207–8 (1986). A motion for reduction of sentence under Rule 35(b) was, in effect, a postsentence plea for leniency and was addressed to the discretion of the sentencing court. The denial of such a motion is reversible only for gross abuse of discretion. *See United States v. Corsentino*, 685 F.2d 48, 51 (2d Cir.1982); 8A *Moore's Federal Practice* ¶ 35.02[3].

Mescaine's motion invoked Rule 35(b), and he urged the district court to use its "discretionary authority" to reduce the sentence. The principal thrust of the motion, however, was that the length of the sentence was caused by misinformation, implying that perhaps Rule 35(a) was the appropriate frame of reference. We conclude that, under either section of the Rule, the denial of his motion should be upheld.

■ In considering a Rule 35(a) motion to correct a sentence allegedly based on misinformation, just as in considering a presentencing challenge to the accuracy of information in a presentence report, *see* Fed.R.Crim.P. 32(c), the court may, in its discretion, hold an evidentiary hearing on the motion, or it may make a finding that the challenged information was not unreliable, or it may determine that the challenged information was not essential to the court's view as to the appropriate sentence. In the present case, the court chose the third course, concluding that its original view of Mescaine as an actor "at the higher level of this particular operation" would be unchanged even if it disregarded the two challenged categories of evidence. Mescaine argues that the remaining evidence was insufficient to support the view that he was the source of the cocaine or a higher-up in the conspiracy. We uphold the denial of the motion because we cannot say that the court's view as to Mescaine's role based solely on the unchallenged evidence was clearly erroneous, and because, in any event, Mescaine's presentation was insufficient to require the court to disregard the trial evidence that Akhtar had identified Mescaine as the source.

■ Taken in the light most favorable to the government, the unchallenged evidence, *i.e.*, the evidence other than the

statements attributed to Mescaine himself and Akhtar's statements that Mescaine was the source, showed the following. Mescaine first arrived at the scene of the proposed drug transaction at about the time the cocaine was supposed to be delivered. He arrived in an automobile in which, according to Akhtar, the cocaine was to arrive. He got out and walked toward the building where the sale was to occur. When members of the conspiracy became suspicious of the surveillance agents in the area and decided to delay the transaction, Mescaine promptly left the area. After the signal had been given that it was safe to return, Mescaine returned to the building and accompanied Rojas, who was delivering the cocaine, and Akhtar to the sixth floor of the building. He waited in the hallway of 6M while Blount examined the cocaine, then left Rojas and the cocaine on the sixth floor and rode the elevator to the street with Blount and Akhtar. Mescaine then walked to the corner and stood there until Rojas came out with the cocaine. And as soon as Rojas delivered the cocaine to Blount, Mescaine sought to depart.

Plainly it was permissible for the court to view Mescaine's overall conduct, including his arrivals at the scene of the transaction at precisely the critical times, his initial departure as soon as danger was sensed, his attempted departure as soon as the cocaine had been delivered, and his accompanying Rojas and Akhtar to 6M, as participation in the narcotics conspiracy rather than as merely coincidental presence. *See, e.g., United States v. Pedroza,* 750 F.2d 187, 198–99 (2d Cir.1984), *cert. denied,* —— U.S. ——, 107 S.Ct. 151, 93 L.Ed.2d 92 (1986). Further, Mescaine's behavior was typical of conduct engaged in by suppliers of high-grade narcotics when a sale is to be made to a new buyer. In *United States v. Rahme,* 813 F.2d 31 (2d Cir.1987), for example, a co-conspirator's identification of the defendant as the source of his heroin was corroborated in part by the defendant's positioning himself in a way that allowed him to watch the transaction while physically distancing himself from it. We noted that Rahme, who had accompanied

the coconspirator to preliminary meetings at which the proposed sale was discussed but had not joined in the discussions, appeared at the scene of the final meeting and sat at a separate table; and "when the other [coconspirators and the undercover agent] left to consummate the transaction in the parking lot, Rahme got up from his seat and left the lounge, and watched the three walk down the corridor and out of the hotel." *Id.* at 36–37. In *United States v. Oddo,* 847 F.2d 1003 (2d Cir.1988), we noted that expert testimony established that "the supplier of the drugs is often present when his drugs are being sold via a third party to a new buyer"; that "the high quality of the cocaine (96% pure) indicated that the transaction was close to its prime source"; and that the fact that the defendant "was unarmed and observed the exchange [of two kilos of cocaine for money] from a safe distance" was "typical behavior for a supplier." *Id.* at 1008–09. Mescaine's actions at the scene of the present transaction were similar to those of the suppliers of the narcotics at issue in *Rahme* and *Oddo.*

Nor did Mescaine appear to have any other function in the conspiracy. Plainly the other key roles were filled by his codefendants. Akhtar was the contact man, handling the negotiations with Blount; Torres provided the meeting place where the cocaine could safely be inspected; Rojas physically delivered the cocaine; and Garcia was concerned with security.

In sum, taking all of the unchallenged evidence in the light most favorable to the government, including both Mescaine's conduct which was typical of that of a supplier or a leader of the conspiracy and the well-defined subordinate roles of his coconspirators, we conclude that the district court's view that Mescaine was probably the source of the cocaine or at least a higher-up in the conspiracy was not clearly erroneous.

■ Further, Mescaine's challenge to Akhtar's explicit statements, as described by Blount at trial, that Mescaine was the source of the cocaine was insufficient to require the district court to disregard those

statements in assessing Mescaine's role. A sentencing court is entitled to rely on information developed in the course of an adversarial proceeding that was subject to the rules of evidence, *see United States v. Romano*, 825 F.2d at 729, and unless the defendant who seeks to impeach that evidence makes a showing that casts substantial doubt on its reliability, the court may continue to rely on it. Mescaine's challenge consisted of the Kheel affidavit, which stated that Akhtar's attorney had told Kheel that Akhtar had said recently that he had not met Mescaine before January 15. Even if this affidavit, which is itself at least double hearsay, were accepted at face value, the fact that Akhtar had not previously met Mescaine would not necessarily mean that Akhtar's identifications of Mescaine as the source would have been either inadmissible or unreliable. If Akhtar had not met Mescaine prior to January 15 but had simply been told by another coconspirator that Mescaine was the source, Akhtar's identifications would have been nonhearsay statements in furtherance of the conspiracy, admissible at trial under Fed.R.Evid. 801(d)(2)(E), *see United States v. Rahme*, 813 F.2d at 35–36, and plainly would have been information on which the court was entitled to rely in determining what sentence to impose on Mescaine, *see United States v. Romano*, 825 F.2d at 729. And in light of the corroborating circumstances, including Mescaine's conduct that was typical for a supplier, the sentencing court would have been entitled to rely on the statements attributed to Akhtar even if they had not been admitted at trial. *See United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *Williams v. New York*, 337 U.S. 241, 250–51, 69 S.Ct. 1079, 1084–85, 93 L.Ed. 1337 (1949); *United States v. Romano*, 825 F.2d at 729; *United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir.1986).

In sum, we conclude that the evidence exclusive of the statements attributed to Mescaine himself was sufficient to support the district court's view of Mescaine's role in the conspiracy even if the Akhtar statements were also excluded, and that the Akhtar statements, which explicitly supported the court's view, could properly have been considered. Accordingly, Mescaine's sentence was not imposed in an illegal manner, and the denial of the motion was not an abuse of discretion.

## CONCLUSION

We have considered all of Mescaine's arguments in support of this appeal and have found them to be without merit. The order of the district court denying the motion for a reduction of sentence is affirmed.