March 29, 1993 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-2025

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 PETER J. REGAN,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. A. David Mazzone, U.S. District Judge]
 

 

 Before

 Boudin, Circuit Judge,
 

 Aldrich, Senior Circuit Judge,
 

 and Stahl, Circuit Judge.
 

 

George F. Gormley with whom John D. Colucci was on brief for
 
appellant.
Ralph F. Boyd, Jr., Assistant United States Attorney, with whom
 
Robert J. Lynn, Assistant United States Attorney, and A. John
 
Pappalardo, United States Attorney, were on brief for appellee.
 

 

 March 29, 1993
 

 ALDRICH, Senior Circuit Judge. Defendant Peter J.
 

Regan, who pled guilty to 55 counts of bank embezzlement (18

U.S.C. 656) on February 18, 1992 with no reservations or

conditions now relevant, appeals with respect to his U.S.

Sentencing Guidelines sentence of 40 months, (a) because he

was not allowed a hearing on oral testimony with respect to

his claimed deduction on account of diminished capacity; (b)

because he was sentenced under guidelines issued later than

the dates of some of his actions, and (c) because there were

enhancements made for abuse of trust and for more than

minimum planning. We affirm.

 Defendant, during the period covered by the

indictment, viz., November, 1987 to July 16, 1991, was a

senior vice president in charge of the Special Loan Services

Division of the Shawmut National Bank. As head of this

division, defendant directly supervised and controlled the

collection and "work-out" of delinquent and problem

commercial loans. Because of the individuality of this work

and defendant's seniority, he was extraordinarily

unsupervised, all the way from his actions in causing debits

or credits to Shawmut's cash collateral account, down to his

maintaining personal custody of the files. During the period

in question he exercised this freedom in a number of manners

so as to embezzle some $2,500,000 from the Bank. On July 16,

 -2-

1991, by reason of a conspicuous act, he was discovered. He

was promptly indicted and, in due course, pleaded guilty.

 Diminished Capacity
 

 Defendant first challenges the district court's

refusal to hold an evidentiary hearing on his entitlement to

a downward departure for diminished mental capacity.

Sentencing Guidelines 5K2.13 provides as follows:

 5K2.13. Diminished Capacity (Policy
 
 Statement)

 If the defendant committed a non-violent
 offense while suffering from
 significantly reduced mental capacity not
 resulting from voluntary use of drugs or
 other intoxicants, a lower sentence may
 be warranted to reflect the extent to
 which reduced mental capacity contributed
 to the commission of the offense,
 provided that the defendant's criminal
 history does not indicate a need for
 incarceration to protect the public.

The burden of proving causation is on the defendant, and

there can be no appeal from the district court's denial of a

reduction. United States v. Lauzon, 938 F.2d 326, 331 (1st
 

Cir.), cert. denied, 112 S.Ct. 450 (1991); United States v.
 

Shattuck, 961 F.2d 1012 (1st Cir. 1992). However, "[w]hen
 

any factor important to the sentencing determination is

reasonably in dispute, the parties shall be given an adequate

opportunity to present information to the court regarding the

factor." U.S.S.G. 6A1.3(a). Except with respect to cross-

examination, post, defendant does not claim that his
 

 -3-

presentation was substantively curtailed; his complaint is

that the refusal to hear it on oral testimony was an abuse of

discretion. United States v. Gerante, 891 F.2d 364, 367 (1st
 

Cir. 1989); see also Fed. R. Crim. P. 32(a)(1).
 

 In the written record there was the pre-sentence

report containing a lengthy statement from defendant and

favoring and unfavoring opinions of experts. The court chose

to accept the latter, concluding,

 I have no confidence at all . . . in that
 defense. I have no doubt that this case
 has had a severe and traumatic effect on
 Mr. Regan, but I fear that that all took
 place after he was caught. I do not
 believe he was diminished in his
 capacity. I accept the report of Doctor
 Strasburger. And during the course of
 his criminal conduct, he was not
 diminished in his capacity.

We review the evidence as the best approach to defendant's

contention that the court abused its discretion in denying

oral presentation. Basically, defendant contends diminished

capacity produced a delusional conviction that the country

was faced with economic, and hence political, chaos for which

he must fortify himself. In the late 1970s and early 1980s

he stored dried foods in his cellar, ultimately several

years' supply, stored firewood, and made arrangements for

water and other necessities. These were all acquired with

defendant's own earnings. Commencing in November 1987,

however, defendant exercised what the record shows to have

been highly skillful and comprehensive methods -- hence the

 -4-

55 counts -- to divert Bank funds. Their ingenuity and

effective concealment, evoking no suspicions, show remarkable

ability. The proceeds largely were salted away in Swiss bank

accounts. Shortly after his discovery and discharge by

Shawmut, defendant voluntarily entered McLean Hospital, where

he was found to be profoundly disturbed. At first his

condition was too serious to assist in his defense, but after

two admissions he sufficiently recovered, and ultimately was

allowed to plead.

 In connection with the coming sentence hearing

defendant submitted records from McLean Hospital and letters

from three psychiatrists. The earliest was from a McLean

Hospital doctor, Joseph Triebwasser, dated August 9, 1991, at

which time defendant was severely psychotic, indicating that

this severe illness was consistent with his alleged criminal

activities prior to his admission. This brief letter was

addressed to insurance coverage and is of no substantial

value. On November 21, 1991 Dr. Martin J. Kelly addressed a

letter to the court with relation to defendant's then

inability to participate in legal activities. This was

followed by a letter from Dr. Kelly with reference to

sentencing, dated December 13, 1991 in which the doctor spoke

 -5-

of defendant's competence, his high intelligence, and his

ability

 to function, except when it deteriorates
 into psychosis as it has from time to
 time over the past 10 years. . . .[1]

 It is difficult to say that Mr.
 Regan did not have the capacity to known
 (sic) the nature and quality of his acts
 or did not have the capacity to know that
 what he was doing was wrongful in light
 of his own behavior, his capacity to
 function at work, and as mentioned, his
 intelligence. But, the behaviors seem to
 me in large measure driven by his
 psychiatric problems which occasionally
 deteriorate to the point of faulty realty
 testing and frank psychosis. However,
 for much of the past 10 years he has not
 
 been in a psychotic state and during
 those periods was also involved in
 hoarding money as well as provisions and
 arming himself in anticipation of the
 looming economic collapse and resultant
 anarchy. (Emphasis in original).

This was followed by a letter from Dr. Pierre V. Mayer in

which he said,

 I wanted to let you know that I have
 received Dr. Kelly's report and
 essentially agree with his findings. (I
 would qualify this by adding that I am
 not convinced that Mr. Regan did not have
 some degree of psychosis over the past 10
 years).

 This less than forceful opinion was followed by a

further letter from Dr. Kelly.

 

1. We interject here that there is no evidence beyond
medical opinion, except from defendant himself, that his
abilities ever deteriorated or faltered. His associates
never observed such.

 -6-

 In response, the government submitted a report from

Dr. Larry H. Strasburger. After indicating that he had

reviewed defendant's personal history as given to him in an

interview and the medical records, the letters from

defendant's experts, and interviews with officers at the Bank

who had dealt with defendant, the doctor concluded as

follows:

 There was no information available
 to this examiner which would corroborate
 the existence of a psychosis prior to Mr.
 Regan's hospitalization in July of 1991.
 While delusional beliefs and psychotic
 thinking may have been present prior to
 the discovery of Mr. Regan's
 embezzlement, these phenomena were not
 evidenced to the coworkers whom I
 interviewed. They stated that Mr.
 Regan's capacity to think clearly and
 effectively was an extraordinary one,
 quite at variance with the psychotic
 mental state documented on his hospital
 admissions and during my interviews with
 him. It is entirely possible, indeed
 even likely, that his psychosis was
 precipitated by the discovery of his
 misappropriation of funds.

 Even were Mr. Regan's psychosis to
 have existed prior to his embezzlement
 coming to light, the evidence that it
 affected his thinking and diminished his
 mental capacity is confined to his own
 statements. The bank officers whom I
 interviewed describe him as an extremely
 effective thinker, negotiator, and
 problem solver. Even were he to have
 held delusional ideas, there is no
 evidence that his cognitive capacities
 were impaired by them. It is quite
 possible that, even if he had entertained
 delusions, he could also have
 misappropriated funds simply for personal
 gain. Given the information available to

 -7-

 me, it is not possible to resolve this
 question from a psychiatric perspective.

 Prior to the sentencing hearing defendant moved to

present oral testimony of the doctors and for permission to

cross-examine Dr. Strasburger. The court denied this motion.

At the hearing, after briefly stating its reasons for

concurring with Dr. Strasburger, it expressed its ultimate

conclusion previously quoted.

 Following its decision from the bench, the court

allowed defendant to file an offer of proof to permit the

court to reconsider. Thereafter defendant filed a further,

two page letter from Dr. Kelly, and a seven page, single-

space, letter from Dr. Mayer. The former added little. The

second was full and detailed, but, at bottom, did not change

the picture; there remained two views. We have, therefore,

an experienced judge, who spoke thoughtfully, "I have

reviewed this record very carefully, and I have done it

several times over the past week." The record was unusually

extensive. In addition he agreed to receive further proof,

and no doubt equally considered it. That this evidence was

not allowed to be presented orally was well within the

court's discretion. United States v. Pugliese, 805 F.2d
 

1117, 1123 (2d Cir. 1986). See also U.S.S.G. 6A1.3
 

Commentary.

 There remains that defendant was not allowed to

cross-examine Dr. Strasburger. We have never held it an

 -8-

abuse of discretion to deny cross-examination in sentencing

hearings. E.g., United States v. Zuleta-Alvarez, 922 F.2d
 

33, 36 (1st Cir. 1990), cert. denied, 111 S.Ct. 2039 (1991).
 

This would not be the case to begin. While offers of proof

are not normally required in connection with cross-examining

a hostile witness, see United States v. Colonial Motor Inn,
 

Inc., 440 F.2d 1227, 1228 (1st Cir. 1971), this was an area
 

where defendant should well know what he would ask or try to

elicit from Dr. Strasburger. Cf. United States v. Shattuck,
 

ante. In his offer of proof he made no substantive
 

suggestions. We see no error.

 In closing this aspect, this is not a case where

the defendant was of general diminished capacity, but quite

the contrary. His extreme views were on a single subject,

and even here they merely pursued opinions that were held by

other doomsayers, and envisioned conditions not unknown to

history. Defendant had read depressing books, and his work

in the Bank was with economic entities that were moribund, or

nearly so. Even if a reduced sentence could be warranted in

the case of a single delusion, it does not follow that a

delusion means psychosis. In any event, according to his own

expert, defendant continued his conduct, which he knew to be

wrongful, during intervals when, concededly, he was not

psychotic. This is an unusual case, and we have given it

much attention, but the court had defendant's case fully

 -9-

before it, and we believe that to complain about a breach of

discretion in not receiving it orally is truly frivolous.

 -10-

 Continuing Offense
 

 During Regan's embezzlement activities the United

States Sentencing Guidelines 2B1.1(b)(1) was amended with

the result of increasing the base level enhancement for the

amount here embezzled from twelve levels to fifteen. See
 

U.S.S.G. Manual, Appendix C, pp. 39-40, Amendment No. 99

(effective Nov. 1, 1989). The court applied the amendment,

and defendant complains this was an ex post facto
 

deprivation. The ex post facto clause of the Constitution
 

"forbids the application of any law or rule that increases

punishment for pre-existing conduct." United States v.
 

Havener, 905 F.2d 3, 5 (1st Cir. 1990); Miller v. Florida,
 

482 U.S. 423 (1987). Where a "continuing offense" straddles

the old and new law, however, applying the new is recognized

as constitutionally sound. E.g., United States v. Arboleda,
 

929 F.2d 858, 871 (1st Cir. 1991). See also United States v.
 

Fazio, 914 F.2d 950, 959 n. 14 (7th Cir. 1990) (collecting
 

cases). We agree with the defendant that the cases relied on

by the government can arguably be distinguished in the sense

that all involved true straddles where the offense itself

began before the increase in sentence but concluded

afterwards. The government says that this was all one

scheme, though variously carried out, to use defendant's

office to embezzle from his employer. However, pursuant to

the substitute indictment, defendant was formally sentenced

 -11-

for some offenses that were completed before the guideline

increase and, if the prior guideline were applied (either to

all the counts or through some "blended" method), his

sentence would be lower.

 Nevertheless, we think it constitutional that the

defendant be subject to the sentence actually imposed even if

no increased penalty is permitted for the convictions that

occurred before the guideline increase. Under the guidelines

the prior acts of embezzlement were "relevant conduct" that

would enhance defendant's sentence for the embezzlements that

occurred after the guideline increase even if he had been

convicted only on the latter counts. U.S.S.G.
 

 1B1.3(a)(2); 3D1.2(b), (d). These two guidelines taken

together base the sentence on the full amount embezzled

during the same course of conduct or as part of the same

scheme or plan even if a defendant is indicted and convicted

on just one of the counts. See U.S.S.G. 3D1.2, Note 4,
 

example 4. In this instance, however pleaded, the

defendant's embezzlements were manifestly part of the same

ongoing scheme of embezzlements.

 The guidelines' criminal history provisions are

routinely applied to increase sentences based upon

convictions that occurred before the guidelines were adopted.

Cf. United States v. Ykema, 887 F.2d 697, 700 (6th Cir.
 

1989), cert. denied, 493 U.S. 1062 (1990); United States v.
 

 -12-

Cusack, 901 F.2d 29, 32 (4th Cir. 1990). For example, a
 

repeat offender statute may increase the sentence for a later

crime based on convictions that occurred before the statute

was enacted. See United States v. Ykema, ante, (citing
 

cases). In those cases, as in this one, the defendant has

fair warning at the time he commits his later acts that the

prior ones may or will be used in determining his sentence

for the latter ones. Cf. Amaral v. I.N.S., 977 F.2d 33, 36-
 

37 (1st Cir. 1992). Accordingly, there is no ex post facto
 

violation in this case. It may be that some of defendant's

earlier 40 month sentences could not be supported, but they

are to be served concurrently, and as defendant has not

suggested prejudice we do not pursue the matter.

 Enhancements
 

 Finally, defendant complains that there should have

been no enhancements under U.S.S.G. 3B1.3 "for abuse of

trust," and under 2B1.1(b)(4) for more than minimum

planning. Defendant, in talking about abuse of trust, which

he says is already included in embezzlement, neglects that

 3B1.3 includes "special skill." The court dealt

unanswerably with defendant's special skill. Defendant

complains, equally unwarrantably, that the size of the

embezzlement, for which his sentence was increased,

necessarily assumed planning, so that to add more for the

 -13-

planning was redundant. There could be no end to such a

contention.

 Affirmed.
 

 -14-