■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NORMAN HOWARD, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Kings County (Quinones, J.), rendered November 13, 1986, convicting him of robbery in the first degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed.

On appeal, the defendant contends, *inter alia,* that the evidence adduced at trial was legally insufficient to support the jury verdict of guilt, that the verdict was against the weight of the evidence, and that he was deprived of a fair trial as a result of the trial court's failure to give an alibi charge. We disagree and, accordingly, affirm the judgment of conviction.

The evidence adduced at trial established that on the morning of July 13, 1985, at approximately 9:00 A.M., the 23-year-old complainant entered the subway station at Washington and Lafayette Avenues in Brooklyn on her way to work. When the complainant descended the stairs of the subway station and reached the mezzanine level, she was approached from behind by the defendant who cornered her against the wall. The complainant, who at this point was facing the defendant, observed that he was carrying a silver jackknife which had a 2½-inch blade. The defendant demanded the complainant's money and wristwatch and while the defendant was looking through the complainant's wallet, the complainant screamed and ran up the stairs to the street. The complainant estimated that the entire incident lasted approximately one or two minutes and that the lighting conditions were sufficient for her to see the defendant, who stood approximately two feet away from her. The complainant described the defendant as a "lite-skinned" black man or a "darker skinned" Hispanic male approximately 5 feet, 7 inches tall and 120 pounds. The defendant, on the morning in question, was wearing a red tee shirt and jeans with a white cloth bandana around his forehead which came down to his eyebrows. The defendant's hair was "kind of poofed up a little above it". The complainant also testified that the defendant's face was "scruffy" and that his teeth were crooked. When

asked if she noted anything in particular about the defendant's eyes, the complainant stated: "No, I didn't. He was talking softly, he was whispering, so I was * * * looking, [at] his mouth and jaw area trying to make sure that I understood".

Less than one month after the robbery, the complainant identified the defendant in a lineup. At that time, the complainant first observed that there was "something wrong with one [the defendant's] eyes" and that it was "half closed".

The defendant's mother testified on the defendant's behalf and stated that the defendant's father had died several days prior to the day of the robbery and that on July 12, 1985, the defendant had his head shaved in preparation for his father's funeral which was held that afternoon. The defendant's mother also stated that in March 1984 her son was treated in the hospital for an eye injury caused by lye, which left his right eye partially closed. On cross-examination, the defendant's mother testified that on the morning of July 13, 1985, she woke up at 8:00 A.M. and went to the kitchen to make breakfast. She did not see the defendant until 10:00 A.M. when he came downstairs wearing pajamas. The defendant's mother acknowledged that it was possible for someone to exit the house without passing through the kitchen. On redirect examination, however, the defendant's mother stated that she would have heard someone leaving the house during this period because the door made a loud noise.

The defendant's son and sister as well as a close family friend also testified that the defendant was clean shaven on the day before the robbery was committed.

The defendant never requested that the trial court give an alibi charge nor did he take an exception to the jury charge because of the absence of such a charge. During its charge, the court did, however, emphasize the fact that the defendant was not required to "prove anything" and that the prosecution's burden of proving each and every element of the crime beyond a reasonable doubt never shifted to the defendant. The court also gave the jury a detailed identification charge.

Based upon a review of the record, we find that the evidence adduced at trial, when viewed in a light most favorable to the prosecution (see, People v Contes, 60 NY2d 620), was legally sufficient to support the verdict of guilt beyond a reasonable doubt. Although the evidence against the defendant was provided solely by the complainant, she testified that she was able to observe the defendant at close range for one to two

minutes under adequate lighting conditions and, while she did not observe the defendant's half-closed right eye, she was able to provide the police with a fairly detailed description of the defendant. Moreover, the complainant, in selecting the defendant out of a lineup less than one month after the robbery, stated that she was "very sure" that the defendant was the person who committed the robbery.

Upon the exercise of our factual review power (CPL 470.15 [5]), we conclude that the verdict of guilt was not against the weight of the evidence. As stated above, although the complainant acknowledged her failure to observe the deformity in the defendant's right eye, she explained that her failure to do so was attributed to her focusing her attention on the defendant's mouth and jaw area. On this point, it should be noted that the jury was able to observe the defendant's right eye area first hand and obviously concluded that the complainant's failure to observe this physical characteristic in the defendant's appearance was not fatal to the People's case. Moreover, the defense witnesses' testimony to the effect that the defendant's head was clean shaven on the day prior to the robbery presented an issue of credibility to be determined by the jury which saw and heard these witnesses (see, People v Gaimari, 176 NY 84, 94), and which was thoroughly charged on the issue of identification. We find that the jury's determination herein, which is to be accorded great weight on appeal and is not to be disturbed unless clearly unsupported by the record (see, People v Garafolo, 44 AD2d 86, 88), was not against the weight of the credible evidence.

Finally, we note that the defendant's contention that he was denied a fair trial by reason of the trial court's failure to give an alibi charge has not been preserved for appellate review since the defendant neither requested such a charge nor excepted to the jury charge on this basis (CPL 470.05 [2]). Moreover, given the circumstances of this case, we decline to reach this issue in the exercise of our interest of justice jurisdiction (CPL 470.15 [6]). In the first instance, the focus of the asserted defense in this case was not an alibi, but rather that the defendant did not fit the description of the perpetrator by virtue of his disfigured eye and clean-shaven head. In fact, the alibi evidence was first elicited by the prosecutor during his cross-examination of the defendant's mother. Additionally, we find that while the trial court did not give an alibi charge, it did emphasize to the jury that the People bore the burden of proving each and every element of the charged crime beyond a reasonable doubt and that the burden of proof

never shifted to the defense. In view of these factors *(cf., People v Klemm,* 124 AD2d 826), as well as the absence of any reversible trial errors in the record *(cf., People v Vera,* 94 AD2d 728), we conclude that the absence of an alibi charge did not deprive the defendant of a fair trial.

We have reviewed the defendant's remaining contentions and find them to be either unpreserved for appellate review or without merit. Mollen, P. J., Spatt and Sullivan, JJ., concur.

Rosenblatt, J., dissents, and votes to reverse the judgment of conviction and to dismiss the indictment with the following memorandum: I recognize fully that the majority position is based on the well-established proposition that a legal case may rest on the identification testimony, without more, of a single eyewitness *(People v Arroyo,* 54 NY2d 567, 578, *cert denied* 456 US 979). We have acknowledged this concept time and time again *(see, e.g., People v Hooper,* 112 AD2d 317; *People v McCrimmon,* 131 AD2d 598; *People v Azzara,* 138 AD2d 495) and, as an abstract rule, I agree with it.

Those experienced in the investigation and trial of criminal cases will be the first to say that the one-on-one identifications are the most troublesome when, as here, they are unaccompanied by supporting proof. However, often where there is no supporting proof, the identification is compelling and adequate. In this case, the circumstances surrounding the identification of the defendant leave me with the disquieting feeling that an innocent man may have been convicted.

It is not a question of poor lighting, or a fleeting view, or other conditions that sometimes undercut identifications. Rather, the victim, an intelligent, well-educated, and articulate person, gave the police what was, in some ways, an uncommonly detailed account of the assailant, including his facial features, his teeth, and, as she described it, his "poofed-up" hair above his white bandanna.

The robbery occurred on July 13, 1985. Shortly after the robbery, the victim told the police that she saw her assailant's eyes and noticed nothing unusual about them. She added that her assailant was clean shaven, a description somewhat at odds with her trial testimony. When the defendant was arrested he was anything but clean shaven; he had a mustache and beard.

The victim selected the photograph of the defendant from a photographic array. On September 3, 1985, almost two months after the robbery, she identified him in a lineup. When she viewed the lineup, she noticed that the person she selected—

the defendant—"had a funny eye". This feature was so obvious to her that she noticed it at the lineup when she was at a distance far greater than what she described as the 1½-to-2-feet distance between her and her assailant at the time of the robbery.

In March 1984 the defendant was totally blinded, from lye, in his right eye, and partially blinded in his left eye. Whether it be described as permanently, partially closed, with scar tissue, or, as described in the defendant's brief, as "grossly disfigured", and "welded shut", there is no doubt that it was a striking characteristic. It was not in the photograph (which was taken before the blinding incident), but it was immediately evident to the victim when she viewed the defendant in the corporeal lineup.

Moreover, while the victim described her assailant's hair as "poofed up", defense witnesses testified that the defendant's father died on July 12, 1985, the day before the robbery, and that the defendant's head was shaved bald for the funeral, possibly for religious reasons. When the defendant was placed in the September 3, 1985 lineup, his hair was undeniably close cropped.

There was also alibi evidence presented by the defendant. If the identification testimony had been compelling, the court's failure to give an alibi charge would be of no great consequence, considering that one was not requested. In this case, the lack of an alibi charge was significant, and in this regard I note that this court has reversed convictions in the exercise of its interest of justice jurisdiction where an alibi charge was appropriate but was neither sought nor given *(People v Klemm,* 124 AD2d 826; *People v Vera,* 94 AD2d 728).

All there is to link the defendant with this robbery is an identification originating from a photographic array in which the defendant's photograph differed from his appearance on the date of the robbery, and a lineup identification in which the victim, for the first time, noticed a highly distinctive facial feature. The risk of misidentification is too great, in my view, to allow the conviction to stand *(People v Crum,* 272 NY 348).

Even though the evidence could technically make out a legal case, I would reverse the conviction and dismiss the indictment on the facts and as a matter of discretion in the interest of justice (CPL 470.15 [3] [c]; *People v Crudup,* 100 AD2d 938; *People v McCann,* 90 AD2d 554; *People v Kidd,* 76 AD2d 665).