THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. WILLIAM CRUM, Appellant.

(Argued November 30, 1936; decided December 31, 1936.)

*Henry Grusky* and *J. Allan Ballman* for appellant.

*Henry Hirschberg, District Attorney,* for respondent.

CRANE, Ch. J. The Constitution of this State in article VI, section 7, provides that the jurisdiction of

the Court of Appeals, except where the judgment is of death, shall be limited to the review of questions of law. " This," said the court in *People* v. *Gaffey* (182 N. Y. 257, 259), " enables us to review the facts in capital cases as we always did." A review of the facts means that we shall examine the evidence to determine whether in our judgment it has been sufficient to make out a case of murder beyond a reasonable doubt. We are obliged to weigh the evidence and form a conclusion as to the facts. It is not sufficient, as in most of the cases with us, to find evidence which presents a question of fact; it is necessary to go further before we can affirm a conviction and find that the evidence is of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty beyond a reasonable doubt.

A reading of this record causes me to hesitate. I am not convinced. I have a reasonable doubt which I shall attempt to explain and which, in my judgment, compels us to reverse this conviction and grant a new trial.

Here are the facts: Grover C. Nielson kept a gasoline station on the Walden-Wallkill road about a mile out of the village of Walden. On Saturday night, December 15, 1934, between the hours of eight and nine o'clock at night, he was shot and killed by some person or persons who apparently robbed him in a holdup. The bullet which caused his death had on it such distinct marks and grooves as readily to enable the identification of the pistol, should it ever be found.

On Sunday night, December 16, 1934, Emil Vyborny, having a gasoline station on Bay View avenue and Sylvan boulevard, near Hackensack, New Jersey, was shot and killed in a holdup, and the bullet which caused his death came from the same pistol as did the bullet killing Nielson. The pistol was found by two boys in King's woods, also called King's bluff, near Weehawken, and was given over by them to the police authorities of New Jersey. The pistol and the two bullets are connected without contradiction and with such detail, explanation and identifica-

tion as to convince any one of the facts. The ballisticians, Winslow Humphrey of New Jersey and Harry F. Butts of the New York city police department, as well as Col. Roy B. Jones, state fully the reason for their conclusions. Col. Jones was selected by the defendant and appointed by the order of the court, on the defendant's suggestion, as his expert, and he agrees with both Humphrey and Butts that the Nielson and the Vyborny bullets both came from the same pistol.

We, therefore, start this case with these certain facts: Whoever killed Nielson did so with a pistol which was used the next night in killing Vyborny. The conclusion which one would naturally draw in the absence of any explanation would be that it was the same person who killed both.

At this point the story is taken up by Charles Wiese, whose relation to the defendant Crum is that of an accomplice. He turned State's evidence and in substance gave the following testimony: William Crum, the defendant, the witness Charles Wiese and a man named John Favorito were friends and associates. Wiese had known Crum for about six years, having served with him in the Jersey National Guard. Favorito he had known for about sixty days. Crum lived in Leonia, New Jersey, which borders on, or adjoins, Englewood. These three lived in the vicinity of Leonia and Hackensack.

The pistol in question belonged to Favorito, in whose possession it was. Crum stated that he knew a place near Walden in New York State where they could easily get some money, and the three started out in a car on Saturday afternoon, December 15, 1934, to rob Nielson. They drove directly to Walden and parked the car at James street off Ulster avenue, from which place they walked back to the main section of the village where there was a traffic officer in the middle of the street directing traffic. They stood on the corner, the three of them, for half an hour or more, Crum going into a nearby lunch wagon, kept by Stanley Burton, to purchase cigarettes.

Wiese smoked some of these cigarettes when Crum came back.

Later they drove toward Nielson's place, Wiese protesting that he did not desire to get into any trouble in New York State. Favorito and Crum got out of the car, while Wiese drove a thousand feet or more away. When he came back Crum and Favorito jumped in the car, Crum demanding the wheel, saying they were in a hurry to get away. Crum also said that when they went in Nielson grabbed for a rifle which was on a chair and he (Crum) said to Favorito, " Let him have it; " that Favorito shot Nielson in the hand. Earlier Crum said that they were going to meet some girls in Walden and needed this money to entertain them, but because of the shooting they had to get back to Jersey. When they arrived at Fort Lee in New Jersey in a dance hall Crum gave Wiese four dollars out of the thirty dollars he said they had taken.

On the next night, says Wiese, the three of them held up Vyborny's place, only this time Crum remained in the car while Wiese and Favorito went into Vyborny's gas station where Favorito shot him. Wiese says Crum was looking in the door as he was obliged to drive some people away, and that when they ran out and got in the car Crum " bawled out " Favorito, saying, " The same thing happened last night in the same place."

On both these occasions it will be noted that Favorito did the shooting. While they were escaping from Vyborny's murder, Favorito gave the gun to Crum who promised to hide it or take care of it. The inference is that it was he, in view of this statement, who threw the gun down King's bluff, where it was found by the boy Clifford Warrington, who gave it to Officer Kessner.

This in outline is the testimony against Crum bringing him into the murder of Nielson. If Wiese's story is to be accepted, Crum is guilty of murder in the first degree; but we pause to reflect that under our law no one can be convicted upon the testimony of an accomplice standing alone and unsupported by other proof. Wiese has given

his testimony in much detail, unshaken by cross-examination and without any apparent improbabilities or inherent marks of falsehoods. But who is Wiese? His reputation is bad. He was tried with Favorito and Crum in New Jersey for the murder of Vyborny. Favorito was found guilty and put to death; Wiese received a sentence of twelve to fifteen years, although apparently he was as guilty as Favorito. Crum was acquitted, although Wiese testified against him, refraining, however, from saying anything about the Nielson murder the night before. Wiese had previously had a criminal record, having been convicted of conspiracy, of taking money on two different occasions, and of extorting money on another. Experience has taught the courts to be chary of an accomplice's testimony as there are so many reasons which may lead one to shift to, or share the crime with another.

Thus a witness named Coco, in jail with Wiese in Hackensack, testified that Wiese told him that he had to turn State's evidence against Crum to save his own neck. I place very little reliance on what this witness Coco said; I only refer to it to call attention to the underlying reason and good reason drawn from experience for our statute, section 399 of the Code of Criminal Procedure, reading: " A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime."

" The corroborative evidence need not show the commission of the crime; it need not show that defendant was connected with the commission of the crime. * * * It is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth. The corroboration is not restricted to any particular point. Its connection with defendant's own statements and denials should be considered. * * * It may vary in its nature according to the circumstances of the particular

case. Matters in themselves of seeming indifference or light trifles of the time and place of persons meeting may so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime." (*People* v. *Dixon*, 231 N. Y. 111, 116.)

Without Wiese's testimony there is nothing to connect Crum with the case. The pistol, the bullets, the association with Favorito and the disposition of the pistol are linked up with Crum solely by what Wiese has said. The fact that certain twenty-eight-calibre bullets were found in the bureau drawer of his home in Leonia when it was searched cannot be considered of the least importance. Slight contradictions there were in the explanation the defendant gave as to the manner of obtaining them, but it does not appear that he ever had a pistol or even possessed the one that Favorito carried. The People proved through Favorito's uncle that the pistol belonged to this third accomplice.

We must, therefore, look to other evidence in the case to sustain this conviction, and it is right here that doubt creeps in.

Mr. and Mrs. Burton, who kept the lunch wagon in Walden, were asked to identify Crum as having come into their place to purchase cigarettes on the afternoon or evening of December 15th. Mrs. Burton could not identify him and although Mr. Burton picked out Crum's photograph, he testifies that he is not positive that he is the man, and he might be mistaken. It all depends upon the chief of police in Walden, who was in the middle of the street, directing traffic when these three men are said to have been standing on the corner for half an hour or more.

As the identification of Crum is the crux of the case, let me give George Totty's testimony as it appears in the record:

" Q. Did you sometime in the afternoon or early

evening of December 15, 1934, see the defendant William Crum in the Village of Walden, N. Y.? A. Yes.

" Q. And at the time that you saw him in the Village of Walden, N. Y., were you on duty? A. Yes.

" Q. And whereabouts? A. At the corner of Main and Ulster Avenue.

" Q. Tell the jury briefly just where you saw the defendant, whether he was alone or not, and what if anything you saw him do. A. Well, I first seen him at — or over by the People's Lunch, right by the clock — just below the clock — that's on Ulster Avenue; I seen him standing around the bank there; it was a little unusual to have three strangers around the bank at that time of the year and we don't have so many strangers in Walden in the wintertime; I was going on with my regular line of duty, looking after the traffic and pedestrians and I couldn't watch him right continually. * * * There were three of them.

" Q. Can you tell us whether or not in your opinion Wiese was one of the two men that you saw on this occasion in Walden with the defendant Crum? A. I believe he was. * * *

" A. Well, I couldn't testify to the clothing on any of the three; just the face is all I remember, the faces.

" Q. You wouldn't testify whether or not the defendant Crum had a hat on, would you? A. I think there was one or two that didn't have hats on; I couldn't say which one, I don't think Crum had a hat on and I wouldn't say for sure whether the other two had * * *.

" Q. Now, what characteristics did you identify him by as regards his face? A. Well, in not having much of a chin and what I would call a little over shod * * *.

" Q. How long were you watching the three men? A. Well, I was half an hour but not continually.

" Q. Not continually? A. No

" Q. * * * And at no time did you concentrate your view solely on the defendant Crum, did you? A. Not solely, no.

" Q. How far away was the defendant Crum when you first saw him? A. Well, when I first saw him he would be, well, sometimes — the nearest I was to him was 20 or 25 feet and the farthest would be perhaps 60 * * *.

" Q. Now, Chief, you are quite positive that one of the men you saw in Walden on that day is the defendant Crum? A. Absolutely.

" Q. Don't you believe that you could be honestly mistaken in that? A. Not unless he had a twin brother."

The defendant testified upon this trial that he was never in Walden, so that if Totty is correct in his testimony this circumstance would strongly corroborate Wiese's story and justifies in my opinion the jury's verdict of guilty. Can we say, or should we say that this identification under the circumstances given is sufficient to send a man to his death — to convict him of murder in the first degree? Totty never got nearer than twenty or twenty-five feet, possibly sixty feet to these men; they were standing on the corner in the main street of the village of Walden; Totty was in the middle of the street tending to his duties directing traffic. Nothing happened beyond their mere presence which caused him to give Crum special attention. They were strangers in the town and he was watching them twenty or twenty-five feet away, while directing traffic. While he is positive that Crum is the man, identification under such circumstances is not altogether satisfactory or beyond a peradventure of a mistake. I have no doubt that Totty is giving his honest belief, but are we justified under the circumstances in taking this belief as a finality?

Whatever hesitancy I might have in affirming a death sentence dependent, as it is, upon such identification, I am more than convinced that we should not do it in view of the other testimony in the case.

The president of the Pascach Coach Company, for whom the defendant had worked for a year and a half, the Mayor of Leonia, the former deputy chief of the volunteer fire department and the ex-chief and fire marshal and other citizens gave Crum a good character. He had served in

the volunteer fire department. His mother, his aunt and uncle testified that he was with them at his grandmother's house in Englewood on Saturday afternoon, December 15, 1934, and drove them home to Leonia about half-past eight that evening. Arthur Lamme and Henry Muller, Jr., friends of Crum, testified to having been with him from about eight-thirty o'clock in the evening, meeting him at a moving picture house and going thereafter to a dance in Tenafly. Crum's aunt, who testifies to his presence with her at the time when he was supposed to be in Walden, is a woman of some dependability and character, as for twenty-six years she has been the bookkeeper in the firm of Tippin & Parshall. formerly Thomas Tippin, of Englewood.

We cannot say that the weight of evidence is with the prosecution when Totty's identification runs up against this testimony of the defendant. The truth is hard to find and this court should not readily interfere with verdicts of jurors who have had the advantage of seeing and hearing witnesses. Inconsistencies and strained situations arise in every perplexing case. They do here. For instance, Crum stated on the stand that Wiese had a grudge against him arising out of a quarrel taking place two or three weeks before the fifteenth of December, 1934. " He grabbed hold of me to pull me out of the car and hit me  *  *  *. Then I hit him, and the bus was coming up the road, and he seen the bus and he ran, and the bus stopped, and as the bus stopped he hollered out, ' I will get even with you if it is the last thing I ever do.' " Such was the relationship between these two men, according to the testimony of the defendant. It is this incident which Crum says accounts for Wiese's turning on him and bringing him into the Nielson murder. On the other hand, we have the testimony of Crum's friend, Alphonse Ficaro. He is the man that Crum went to the dance with on Saturday night, December 15th. Crum brings him into the case as a friend and associate, yet Ficaro testifies that when Crum came to see him that morning, Saturday

morning, December the 15th, at his place of work, Wiese was with him. This is hardly consistent with the bad feeling which Crum would have us believe existed between him and Wiese.

Recognizing these various points in behalf of the People, I still am of the opinion that Totty's identification does not remove the doubts, based upon the reasons which I have given, forcing me to conclude that the conviction should be reversed, and a new trial granted.

The judgment of conviction should be reversed and a new trial ordered.

FINCH, J. (dissenting). A majority of the court is about to set aside a conviction for murder in the first degree on the weight of the evidence. In my opinion there was ample evidence to sustain the verdict.

This record shows that one of three men allegedly involved, Charles Wiese, turned State's evidence and testified that this defendant gave the order to another confederate, since executed, to shoot down the keeper of the gas station near Walden in order that the three might profit through the robbery of thirty dollars. This testimony is corroborated by the chief of police in the village of Walden who testifies that it was unusual in the winter time for strangers to be about this village and that for one-half hour he had these three men under surveillance as he stood on the corner of Main and Ulster avenues in that village only twenty or twenty-five feet or at the most sixty feet away, directing traffic. This chief of police, a trained observer, testifies that he identified absolutely this defendant. Crum's own testimony on the stand was such as to impress one with the belief that his entire alibi was fictitious. His story varies considerably from his previous testimony given at the hearing for his extradition from New Jersey. In addition Crum would have us believe that he and Wiese were enemies and that Wiese turned State's evidence to get even with him, whereas a witness who admittedly was a friend and

associate of Crum, namely, Ficaro, testifies that when Crum came to see him on the afternoon of the 15th Wiese was with him. This is in direct contradiction to Crum's statement that the last he saw of Wiese was during a quarrel two or three weeks before the 15th and that thereafter Wiese had a grudge against him. Emphasis is placed on the alibi and character witnesses furnished by Crum. These alibi witnesses were all close relatives, his mother, uncle and aunt; his character witnesses friends of the same relatives. Even Lamme and Muller, whose testimony tends to corroborate his family alibi, were friends of the defendant. His own present associates, the record shows, were criminals of the type of Wiese and Favorito who left his car in Crum's garage. The State also produced two witnesses, Mr. Burton and Mrs. Carmen, who while not so positive as the Walden chief of police, believed they saw Crum or someone a " whole lot like him " near the scene of the crime. Bullets similar in calibre to those used in the murder were found in Crum's bureau. All this last, while not conclusive, surely are at least " matters in themselves of seeming indifference or light trifles " which " so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime." (*People* v. *Dixon*, 231 N. Y. 111.) When to this is added the clear and positive identification of the chief of police, first noted, the verdict of the jury seems justified beyond a reasonable doubt. Other testimony could also be recited to show the guilt of the defendant but all this court need find is that the verdict of the jury is sustained by the weight of evidence beyond a reasonable doubt in finding this defendant guilty of the murder of a law abiding citizen.

The judgment appealed from should be affirmed.

LEHMAN, CROUCH and LOUGHRAN, JJ., concur with CRANE, Ch. J.; FINCH, J., dissents in opinion in which O'BRIEN and HUBBS, JJ., concur.

Judgment of conviction reversed, etc.