Fboessel, J.
On July 4, 1960 the bodies of John Rescigno and Frederick Sess, aged 62 and about 77 respectively, were discovered in the ‘ ‘ little house ’ ’ they shared in Astoria, Queens County. In addition to other wounds, Sess had sustained multiple skull fractures. On Rescigno’s body were about 16 wounds; his jugular vein had been severed. Defendant, Frederick Charles Wood, aged 50, was convicted of murder first degree (two counts) and sentenced to death.
Wood was taken into custody on July 5th. During the automobile trip to the station house, he told a detective that he had received the cut on his right thumb during a barroom altercation, but when asked the same question later at the police station, he replied that he had been cut by glass fragments while striking Rescigno with a bottle. He thereupon admitted having killed Sess and Rescigno on June 30, 1960, and gave a particularized account of how and why he did so. This statement, recorded in *71 shorthand, transcribed, and signed by defendant, was admitted in evidence at trial without objection.
Defendant made no attempt to controvert the evidence which overwhelmingly established that he killed Rescigno and Sess. His sole defense was insanity. Ordinarily, under these circumstances, we would say little more about the evidence relating to the commission of the crimes. Here, however, since it is indicative of Wood’s state of mind on June 30th, we set forth in some detail his statement made to an Assistant District Attorney on July 5th.
Almost at the outset of the interrogation, Wood was asked if he had done something “wrong” in Astoria on the night of June 30th. He replied that he had, that he 1 ‘ knocked off those two guys”, “did them in”, “killed two men”. Defendant then related that at about 3:00 p.m. on June 30th, while he was panhandling on Broadway, New York City, he saw John Rescigno, whom he had never met before, leaving a tavern. Wood had panhandled two dollars, but “ was looking for more ”, He “figured” Rescigno was a “lush” and “might be good for a score ”. Rescigno purchased a bottle of wine. Defendant obtained an invitation from Rescigno to stay at the latter’s house that night. He 1 ‘ figured ” he “ could make a score ’ ’ because Rescigno ‘ ‘ had been drinking like hell ’ ’, and defendant ‘ ‘ knew what the score was and he didn’t ”.
During the subway ride to Astoria, Rescigno said he was a “ pensioner ”, showed Wood his social security card, and “ intimate [d] he has quite a bit of money”, at which point defendant “ developed an idea I would try to take [rob] him during the evening sometime ”. When they arrived at the house between 7:00 and 8:00 p.m., the “apartment” was dark, and Rescigno did not turn on the lights. At the time, defendant saw Sess in bed in a bedroom.
They drank some beer; Rescigno took a drink of muscatel “and he gets silly drunk”, “mumbles unintelligibly”, but Wood finally understood that he suggested they “go to bed together”. Continuing: “* * * I don’t like degenerates. I always had a distaste for them. * * * I knew right then he sealed his fate. I know I’m going to knock him off that night. Not only for his money but for the satisfaction of knocking off a degenerate,” But he could not “ knock him off right away *72 because [he had] to figure out the angles ”. Therefore Wood went “ along with the gag ”, gave Eescigno “ a mushy kiss ”, suggested they take it easy, have some more drinks, and told him he was going to stay all night.
Defendant went to the kitchen to find a weapon. Because it was dark and he did not want to turn on the lights, the only weapon he could find was an empty beer bottle. He took the bottle and a package of cigarettes to Eescigno’s bedroom, offered Eescigno a cigarette because ‘ ‘ just as soon as he reached for the cigarette I had the intention of knocking his brains out, which I did ”. After rendering the victim unconscious, Wood severed his jugular vein with a piece of jagged glass from the broken bottle. Blood was spurting out, but Wood stood to one side in order to keep from soiling his clothes.
After taking two or three dollars from Eescigno’s clothes, Wood remembered a man sleeping in the other room, whom he ‘ ‘ figured ” he “ might as well finish * * * off just on the grounds he might be a degenerate also ”. Defendant returned to the kitchen “ figuring out the best weapon to use on this guy ”. He found a heavy coal shovel, lifted it “ to see if it had the right amount of heft ”, beat Sess on the head with the shovel, then “ flailed him unmercifully” with a chair. Wood, in his own language, “was satisfied in my mind he couldn’t recover”.
Thereupon defendant went to the kitchen, where he washed, and comhed his hair — “I could pass for a Sunday school teacher any place on the face of the earth ’ ’. He then returned to the bedroom, searched Sess’ pockets looking for money but “unfortunately” found none. Defendant did not wish to remain long because he felt that Sess’ “ loud [dying] noise ” and the barking of a dog “would tip off the neighbors that something was wrong ” (emphasis supplied).
Before departing, however, Wood wrote two notes which were found under a cigarette holder on a table in the kitchen. One reads: “ And God bless the Parole Board. They’re real intelligent people”; the other states: “Now, aren’t these two murders a dirty shame. I’m so — o sorry.” Wood engaged in this “ little caper ” to “ dress the two knock offs up a bit ”, and because he has “ a flair for the dramatics at times ”.
The first witness for the defense was the Assistant District Attorney, who had testified for the People regarding Wood’s *73 statement. He now related what Wood told him during the time the statement was being transcribed. Defendant spoke, among other things, about three murders he had committed in the past. He subsequently described them orally and in writing to the psychiatrists who examined him at Bellevue Hospital prior to trial, and who testified with reference thereto. In 1925 when he was about 15 years old, and because “ he couldn’t have her ”, Wood injected arsenic into some cream puffs which he sent to a girl, Cynthia Longo, who died as a result thereof. Thereafter, when he was about 21 years old, he bludgeoned 140 times and stabbed to death a woman he encountered one night. Having contracted syphilis and gonorrhea from another woman, thus becoming angry at women generally, he picked this stranger to kill.
In 1942 defendant murdered John Loman because the latter made a disparaging remark about Wood’s girl friend. Wood caused Loman to become very drunk, attempted to asphyxiate him with gas, and when this failed to achieve the desired result, he bashed in Loman’s head. With the help of his girl friend, Wood hid the body, planning to dismember it later and dispose of the parts. When arrested, he denied his guilt, and the authorities had a “ ‘ hell of a time ’ ” attempting to prove premeditation. Though convicted of murder second degree, defendant said he was “ ‘ actually guilty of Murder in the First Degree ’ ”. He was sentenced to from 20 years to life, only to be paroled less than a month before the present homicides.
Defendant further told the Assistant District Attorney that after the jury’s verdict in the Loman case, but prior to sentence, he slashed his wrists in a suicide “ attempt ”, because he did not want to spend a lot of time in prison, and felt he could obtain better treatment in a hospital. He was sent to Dannemora State Hospital, where he enjoyed himself and was allowed to play cards, but when certain privileges were withdrawn, he became dissatisfied and felt it was time to tell the psychiatrist he was not insane. Defendant boasted that ‘ ‘ Anytime I wanted to, I knew I could get out of there because I wasn’t insane ”; he “could fool anybody ”, he was “fooling the psychiatrist all along ’ ’ and ‘ ‘ could do it anytime ’ ’. He succeeded.
After the hospital released him, Wood was transferred to prison, where he determined to and did become a model prisoner *74 as he sorely wanted to gain freedom. Paroled and assigned to Albany district, Wood obtained employment in a laundry. He was not happy there, however, knew that eventually he would begin drinking again, in which event he would lose his job and be returned to prison, and, therefore, decided to lose himself in New York City.
Although the four defense psychiatrists testified in answer to hypothetical questions that on June 30th defendant was laboring under such defect of reason as to know neither the nature nor the quality of his acts nor that they were wrong, their conclusions were largely weakened by lengthy and vigorous cross-examinations. By contrast, the People’s two psychiatric experts, who testified that Wood was legally sane, were together asked but six questions on cross-examination, to two of which objections were sustained.
When the defense psychiatrists had testified, defendant, against the advice of his attorneys, took the stand, after having been duly cautioned, and stated that, although he was ‘ ‘ very sick ” while at Bellevue for examination, “at the time I committed the crime, the two murders, I knew the nature and I knew the quality of my act. I was sane then, perfectly sane, and I am perfectly sane now ”. He made this statement, he testified, because he had “ been living on borrowed time ” since 1926, and furthermore he did not “relish the prospect of going back to prison for the rest of my life or to any insane asylum ”. He was not cross-examined.
Defendant now merely urges that the People failed to establish beyond a reasonable doubt that he knew the acts were wrong. We now consider this contention. In substance, the expert testimony for the defense was that Wood had schizophrenic reaction, an illness from which he had suffered since about 1926, though “ not probably an organic illness In this connection, the defense psychiatrists stated that although defendant’s memory was good, his sensorium clear, he was unaware of the full significance and consequences of his acts, though he knew their physical nature and quality, and that his judgment was impaired, his reasoning defective. Further, defendant told the psychiatrists at Bellevue that he considered himself to be “ God’s emissary” to take and to save life, and that he was presently charged with the duty of seeking out and killing those *75 whom he believed were degenerates. Their cross-examination established beyond per adventure that Wood knew it was against the law to kill a human being.
One of the People’s psychiatrists, Dr. Winkler, who first examined Wood in July, 1960 at Kings County Hospital and interviewed him in April, 1961, testified that defendant had a ‘ ‘ highly pathological personality * * * a severe personality disorder ”, which manifested itself early in his life, but had not 11 deteriorated ’ ’ since. Dr. Winkler noted that though defendant had been subjected to extensive hospital observation during the course of his lifetime, the diagnosis of schizophrenic reaction was made for the first time at Bellevue in the Fall of 1960. The witness further stated that Wood cannot be called “ mentally ill or psychotic ”, and that his moral judgment was not distorted by illness or disease, but had “never developed ”. Another “ peculiarity ”, Dr. Winkler testified, was defendant’s “ inability to control his impulses ”, a pathological sign but not “legal insanity”. During three weeks’ ■ observation at the hospital in July, 1960, Wood had not shown any evidence of a psychotic condition.
Regarding the “ God’s emissary” delusion, Dr. Winkler entertained “definite doubts ” that this was “a firm, fixed belief ” and gave his reasons therefor. It is of some significance that Wood made this assertion for the first time in a psychiatric examination during the latter part of January or in February, 1961, seven months after the homicides with which he was charged, and following the administration of sodium amytal, a drug which, according to Dr. Winkler, might induce delusions. The Kings County Hospital report of July, 1960 does not contain a reference to this delusion. Most significant is the fact that Wood did not mention the delusion in his July 5th statement, but admitted he did something “ wrong ” on June 30th, namely, killed two men. Indeed, he stated then that he ‘ ‘ always had a distaste ” for degenerates, and had killed Rescigno partly “ for the satisfaction of” killing a degenerate, and partly to steal money. It may also be noted that the “ God’s emissary ” delusion and degeneracy had nothing to do with his previous three murders.
Moreover, he did not just kill Rescigno when he ascertained the latter was a degenerate, but first had to “figure out the *76 angles ”, made sure Ms intended victim was drunk, and then distracted him by offering a cigarette. After the killings, defendant did not tarry long, being apprehensive that Sess’ dying noises and the barking of a dog would alert neighbors to the fact “ that something was wrong ” (emphasis supplied). The People’s psychiatrist, Dr. D’Angelo, supported Dr. Winkler in his view that defendant knew the nature and quality of his acts and that they were wrong.
In People v. Schmidt (216 N. Y. 324, 339-340) Judge Cardozo, discussing the meaning of the word “ wrong ” as used in section 1120 of the Penal Law, held that there are certain circumstances in which the word “ ought not to be limited to legal wrong”. Continuing: “ Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals. Obedience to the law is itself a moral duty. If, however, there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong. It is not enough, to relieve from criminal liability, that the prisoner is morally depraved [citation]. It is not enough that he has views of right and wrong at variance with those that find expression in the law. The variance must have its origin in some disease of the mind (People v. Carlin, 194 N. Y. 448, 455). * * * Cases will doubtless arise where criminals will take shelter behind a professed belief that their crime was ordained by God * * *. We can safely leave such fabrications to the common sense of juries.” (See, also, People v. Ferraro, 161 N. Y. 365, 376-377.)
As defendant concedes in his brief, the Trial Judge correctly charged the jury on the meaning of the word ‘ ‘ wrong ’ ’ when he stated: “When it speaks of the defendant’s ignorance of his act as wrong, the law does not mean to permit the individual to be his own judge of what is right or wrong. It says that the individual has sufficient knowledge that an act was wrong if its perpetrator knows that his act is against the law and against the commonly accepted standards of morality and conduct which prevail in the community of mankind. He must know that his act was contrary to the laws of God and man.” The Trial Judge then stated an example which is so strikingly parallel to defendant’s claim that the jury could not have failed to see the point. *77 Of course the question as to whether Wood knew it was wrong to kill when he killed Sess and Rescigno was a question of fact for the jury, and, as we stated in People v. Horton (308 N. Y. 1, 12), “ * * * if the record in its entirety presents a fair conflict in the evidence, or if conflicting inferences can properly be' drawn from .it, ‘ * * * the determination of the jury will not be interfered with, unless it is clearly against the weight of evidence, or appears to have been influenced by passion, prejudice, mistake or corruption.’ (People v. Taylor, 138 N. Y. 398, 405.) ” We see nothing in the record to take the instant case out of this general rule. Of course the fact that a defendant was suffering from some type of mental disorder (People v. Browne, 2 N Y 2d 842), or that he had a psychopathic personality (People v. Papa, 297 N. Y. 974), or that his “ moral perceptions were of a Ioav order ” (People v. Farmer, 194 N. Y. 251, 265), or that he had an irresistible impulse to commit the crime (People v. Liss, 9 N Y 2d 999), does not immunize him from criminal responsibility under section 1120 of the Penal Law.
There was abundant evidence here upon which the jury reasonably could have rejected entirely the defense that Wood considered himself to be “God’s emissary”. Moreover, the jury, having been properly instructed, could reasonably have found that defendant was operating under a standard of morality he had set up for himself and which applied only to him. The law does not excuse for such moral depravity or “views of right and wrong at variance with those that find expression in the law ” (People v. Schmidt, 216 N. Y. 324, 340, supra). While the very nature and circumstances of the present homicides, as well as the expert testimony on both sides, make clear that Wood was not well balanced mentally, the weight of evidence clearly supports the determination, implicit in the verdict, that he knew not only the nature and quality of his acts, but also that they were wrong, as that term was correctly defined and exemplified by the trial court. Under these circumstances we have no right to interfere with the verdict (People v. Horton, 308 N. Y. 1, 12, supra).
Defendant also contends that he was denied a fair trial on the issue of insanity by reason of various rulings of the court and certain conduct and comment of the prosecutor. One of these contentions relates to the remarks of the prosecutor in his *78 summation concerning two of the defense psychiatrists. Specifically, he referred to them as “the two happiness boys”, as “ those two idiots — I am sorry, those two psychiatrists ”; he “ charged ” them with being “ ignorant, stupid, incompetent ”, and scoffed at their titles of “ Diplómate ”. These remarks were clearly improper, and cannot be justified or excused by anything that transpired earlier in the trial. Although we have been disturbed by this aspect of the case, we have concluded that these remarks, now complained of, did not deprive defendant of a fair trial. Only the first of these comments was objected to at the trial, and it was stricken. Counsel did not object to the summation upon the ground that it or any part' thereof was inflammatory, nor make a motion for a mistrial. While objection need not be voiced in a capital case to preserve a question for our review, we are of the opinion, on the present record, that the prosecutor’s remarks had no influence upon the jury.
We have examined the other contentions of the defendant and find no merit to them.
The judgment appealed from should be affirmed.