**UNITED STATES of America**

v.

**Pablo ESCOBAR and Dandeny Munoz–Mosquera a/k/a "La Quica," a/k/a "Luis Fernando Hernandez–Hernandez," a/k/a "Esteban Restrepo Echavarria, Defendants.**

No. 91–1285(JBW).

United States District Court,
E.D. New York.

Oct. 13, 1992.

Andrew J. Maloney, U.S. Atty., Brooklyn by Cheryl Pollak, Robert A. Feinberg, Brooklyn, N.Y., for U.S.

Richard A. Canton, Richard Jasper, New York City, for defendants.

MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

Defendant's motion to select another judge to try this case is granted. Although

a motion to recuse would have had to be denied and the federal judiciary has declined to recognize the defendant's general right to peremptorily challenge a judge in any case, the special nature of a capital case argues that such a right be afforded where death is a possible penalty. Alternatively, defendant is entitled to have a new judge assigned pursuant to the Guidelines for Division of Business of the United States District Court for the Eastern District of New York. R. 50.3(a), (c).

## I. FACTS

### Prior Proceeding

In September, 1991, the Drug Enforcement Administration received information from Colombian authorities that defendant, Dandeny Munoz–Mosquera, was coming to the United States to carry out a mission, possibly an assassination, on behalf of the Medellin Cocaine Cartel. Munoz was reputed to be a top hit-man for that organization. There were numerous outstanding arrest warrants in Colombia for serious crimes believed to have been committed by him, including homicide, robbery and escape from jail.

Armed with a description of Munoz and his photograph, DEA agents approached Munoz. They asked him for his name. Munoz responded with a false name. A search revealed that he possessed a counterfeit Colombian identification card.

Munoz was indicted for making false and fraudulent statements to federal authorities and for unlawful possession of a false identification document. He was tried before a jury in November, 1991, and convicted on both counts. In the Pre–Sentence Report, the Probation Department computed his criminal history as Category I, since Munoz had no known record of criminal convictions in the United States. Accordingly, they calculated the appropriate guideline sentencing range to be 0–6 months incarceration. In addition, the Probation Department found that there was no basis for an upward departure, since the government's allegations of Munoz's involvement in other serious crimes in Colombia was not supported by any evidence.

The government moved for an upward departure. A *Fatico* hearing was held. Documents and testimony revealed that Munoz had been convicted of armed robbery and charged with murder, escape and weapons possession. Reliable sources identified Munoz as being heavily involved in organizing and carrying out the orders of drug kingpin and co-defendant Pablo Escobar, including multiple murders as well as bombings of police stations and aircraft.

As noted in *United States v. Concepcion*, 795 F.Supp. 1262, 1276 (E.D.N.Y. 1992), the Sentencing Guidelines have no application in such a case. The explicit statutory objectives of deterrence and public protection through incapacitation would not have been served had this defendant been sentenced to a few months of incarceration in accordance with the Guidelines. 18 U.S.C. § 3553. In light of his violent recidivist history in Colombia and his connection to major drug offenders, the heaviest sentence possible was imposed—a cumulative period of six years in a high security prison. The sentence was designed to incapacitate and to send a message to drug smugglers not to send violent criminals to the United States. The Court of Appeals affirmed in a non-published opinion. *Mosquera v. United States*, 962 F.2d 4 (2d Cir.1992).

Even had the Guidelines been applicable, the court would have reached the same conclusion that a maximum sentence was necessary. In calculating a defendant's total criminal history, the Guidelines did not take into account sentences resulting from foreign convictions. § 4A1.2(h). The court is, however, permitted to consider the defendant's past criminal conduct outside of the United States where the criminal history category "significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." § 4A1.3. *See, e.g., United States v. Kikumura*, 918 F.2d 1084, 1114 (3d Cir.1990) (upward departure proper where defendant's terrorist activities in Lebanon, not considered in his criminal history, under-represented the

likelihood that he would commit terrorist crimes in the future). Accordingly, an upward departure would have been warranted.

*Present Proceeding*

Munoz, along with a co-defendant, was again indicted on August 13, 1992. The thirteen count indictment charges Munoz with conspiracy to import and distribute narcotics in connection with activities of the Medellin Cocaine Cartel and accuses him of involvement in drug-related murders including the bombing of Avianca Flight Number 203, in November, 1989, killing 110 passengers and crew. The plane was allegedly destroyed in order to kill suspected informants against the Cartel. If defendant is found guilty of these crimes, a court may impose the death penalty. 21 U.S.C. § 848(e)(1)(A) ("Drug Kingpin Act"). The United States Attorney has requested leave to seek the death penalty.

Defendant made a motion to recuse based on the heavy sentence the assigned judge had imposed in Munoz's prior case. On its own motion, the court requested that counsel consider whether the case was initially properly assigned to this judge under the Guidelines for the Division of Business. Following that hint that a recusal motion was unfounded, defendant withdrew the motion to recuse. Based on the reasons outlined below, the defendant moved to substitute a judge other than the one assigned to the instant case.

## II. MOTION TO RECUSE

Motions to recuse are not encouraged because they place a burden on other judges in the court and disrupt the smooth administration of justice under the Guidelines for the Division of Business. *See generally Guidelines for the Division of Business, United States District Court, Eastern District of New York* and *The Limited Power of the Federal Courts of Appeals to Order a Case Reassigned to Another District Judge*, 120 F.R.D. 267 (1988); *Commentary* by Peter Lushing and Lawrence J. Zweifach, *id.* at 291.

 Information received by a court during the course of the proceedings is not a proper basis for a motion to recuse.

While a defendant in a proceeding has a statutory right to move for recusal based on the alleged bias or prejudice of a judge under 28 U.S.C. §§ 144, 455, the rule applies to what a judge learns from an extrajudicial source, not to information acquired in his judicial capacity. *United States v. Bernstein*, 533 F.2d 775, 785 (2d Cir.1976) (recusal not appropriate where judge's characterization of conspiracy as "this terrible scheme" resulted from information he had gleaned during the course of the proceedings); *See also United States v. Pugliese*, 805 F.2d 1117, 1125 (2d Cir.1986) (no recusal where judge who, in dismissing previous indictment, characterized foreign criminals as the "worst things," was later assigned to try and sentence defendants); *United States v. Serrano*, 607 F.2d 1145 (5th Cir.1979), *cert. denied*, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980) (judge's anti-Colombian remarks during prosecution of large-scale drug traffickers not grounds for recusal in subsequent trial of Colombian drug defendants); requiring recusal: *Aetna Life Insur. Co. v. Levoie*, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (pecuniary interest in the result); *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (racial bias towards ethnic group); *United States v. Bakker*, 925 F.2d 728 (4th Cir.1991) (religious prejudice when group labeled "money-grubbing preachers").

Defendant's motion to recuse was predicated upon the heavy sentence imposed upon him by this court after a *Fatico* hearing. Based on well-established principles, the motion to recuse was without merit.

## III. PEREMPTORY CHALLENGE OF JUDGE

The concept of the peremptory challenge, as applied to jurors, is rooted in English common law. *See generally Swain v. Alabama*, 380 U.S. 202, 212–18, 85 S.Ct. 824, 831–34, 13 L.Ed.2d 759 (1965); Douglas L. Colbert, *Challenging the Challenge: Thirteenth Amendment As A Prohibition Against the Racial Use of Peremptory Challenges*, 76 Corn.L.Rev. 1, 9–12 (1990). Early in our history, Congress established

that the defendant was entitled to peremptory challenges for crimes of treason or other felonies punishable by death. 1 Stat. 119 (1790). The importance of the peremptory challenge in excluding citizens who might be unfair from serving on a jury in capital cases was recognized by the Supreme Court as early as 1887. *Hayes v. Missouri*, 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887).

The peremptory challenge has survived despite criticism of the expense and delays associated with the process, *Current Legislation*, 30 Colum.L.Rev. 721, 726 (1930), and arguments that they create biased panels and biased verdicts. Brent J. Gurney, Note, *The Case For Abolishing Peremptory Challenges in Criminal Trials*, 21 Harv.C.R.–C.L.L.Rev. 227, 230–36 (1986). The right to peremptorily challenge jurors has been characterized as "one of the most important of the rights secured to the accused." *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). Because it provides some assurance that jurors will decide a case based solely on the evidence placed before them, the peremptory challenge "satisfies the rule that 'to perform its high function in the best way' 'justice must satisfy the appearance of justice.'" *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), citing *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

Some argue that these arguments are not equally compelling when applied to the peremptory challenge of the judge. There are, however, currently nineteen jurisdictions that provide a defendant with the right to have an automatic strike when the first judge is assigned. Alaska Stat. § 22.-20.022 (1988); Ariz.Rev.Stat.Ann. § 12–409 (1992); Cal.Civ.Proc.Code § 170.6 (West Supp.1992); Haw.Rev.Stat. § 601–7(b) (1988); Idaho R.Civ.Proc. 40(d)(1) (1987); Ill.Rev.Stat. ch. 38 para. 114–5(a) (1992); Ind.Code Ann. § 35–36–5–1 (Burns 1985); Kan.Stat.Ann. § 20.311d (1988); Minn.Stat. Ann. § 542.16 (West 1988); Mo.R.Civ.Proc. 51.05 (West 1976 & Supp.1992); Mont.Code Ann. § 3–1–804 (1991); N.D.Cent.Code § 29–15–21 (1991); N.M.Stat.Ann. § 38–3–9

(Michie 1992); Nev.Sup.Ct.R. 48.1; Or.Rev. Stat. §§ 14–250–70 (1991); S.D. Codified Laws Ann. § 15–12–22 (1984); Wash.Rev. Code Ann. §§ 4.12.040–50 (West 1988 & Supp.1992); Wis.Stat.Ann. § 801.58 (West Supp.1991); Wyo.R.Civ.Proc. 40.1(b)(1) (1992). *See e.g., People v. Bonds*, 200 Cal. App.3d 1018, 248 Cal.Rptr. 5 (1988) (when peremptory challenge properly made, trial court judge has no choice but to recuse himself); *McCartney v. Comm'n. on Judicial Qualifications*, 12 Cal.3d 512, 116 Cal. Rptr. 260, 526 P.2d 268, 274 (1974), *overruled on other grounds, Spruance v. Comm'n on Judicial Qualifications*, 13 Cal.3d 778, 119 Cal.Rptr. 841, 532 P.2d 1209 (1975) ("The right [to disqualify the judge] is 'automatic' in the sense that a good faith *belief* in prejudice is alone sufficient, proof of facts showing actual prejudice not being required.") (emphasis in original).

More than a decade ago, the American Bar Association adopted two resolutions favoring peremptory challenges of federal judges, first for criminal trials and later for civil trials. Alan J. Chaset, *Disqualification of Judges By Peremptory Challenge*, 1981 Fed.Jud.Ctr. 18–19. The concept continues to find support in the American Bar Association Standards of Judicial Administration. *See A.B.A., Standards as Relating to Trial Courts as Amended 1976 and 1987* § 2.32 and Commentary (means to ensure a party's confidence in the fairness of a judge).

Numerous efforts have been made to adopt procedures for peremptory challenges of federal judges both nationally and in this district. In the early 1970's proposed legislation known as the Judicial Disqualification Act was designed to include a "without cause" affidavit procedure, similar to the California statute described above, for the peremptory challenge of federal judges. The bill was introduced in response to the difficulties inherent in disqualifying a judge under the existing statutes and the heavy burden of proof required of a defendant who, generally, does not enjoy access to information which might constitute a sufficient basis for disqualification. The proposal met with great

resistance. It was never acted upon by Congress. Peter A. Galbraith, Comment, *Disqualifying Federal District Judges Without Cause,* 50 Wash.L.Rev. 109 (1974). *See generally* John P. Frank, *Disqualification of Judges in Support of the Bayh Bill,* 35 Law and Contemp.Prob. 43 (1970). Similar legislation was again proposed in the early 1980's. Alan J. Chaset, *Disqualification of Judges By Peremptory Challenge,* 1981 Fed.Jud.Ctr. 13–16.

Proponents of peremptory challenges of judges argue that such a procedure serves several valuable functions. First, particularly in a criminal trial, the ability to automatically strike the first judge assigned protects the litigant's belief that he has had a fair trial. Even though a judge may act dispassionately in a given case, actual prejudice is difficult to prove. Judges may harbor deep-seated views in certain types of cases or about certain types of defendants. The ability to seek another judge protects the "perception" of fairness.

Second, proponents argue that the ability to challenge a judge might have a salutary effect on the bench as a whole. Since judges, who are often isolated, hear very little criticism of their demeanor and temperament, the peremptory challenge would allow members of the bar to register disapproval of judges in whom they lack confidence. *Committee Report: A Proposal for Peremptory Challenges of Federal Judges in Civil and Criminal Cases* 36 Record 234–36 (1981). *See* John Leubsdorf, *Theories of Judging and Judge Disqualification,* 62 N.Y.U.L.Rev. 237 (1987); Susan B. Hoekema, *Comment, Questioning the Impartiality of Judges: Disqualifying Federal District Under 28 U.S.C. § 455(a).,* 60 Temple L.Q. 697 (1987). *But see* Alan J. Chaset, *Disqualification of Judges By Peremptory Challenge,* 1981 Fed.Jud.Ctr. 57–66, (rejecting the idea that the peremptory challenge procedure would resolve the problems inherent in the current system of challenges for bias).

Alan J. Chaset, who undertook research on the subject for the Federal Judicial Center, argued that the adoption of the challenge would serve a policy that runs counter to the independence which results from life appointments of federal judges and would perhaps "stunt the growth of the law [by eliminating] all but the most passive decision making." *Id.* at 65–66. Other critics oppose on the ground that judges should be free to act without fear of retaliation. There is widespread concern that a policy of permitting challenges to individual judges would be misused in an attempt to judge-shop. Moreover, opponents believe the delay and disruption caused by the procedure would be administratively burdensome. *Committee Report: A Proposal for Peremptory Challenges of Federal Judges in Civil and Criminal Cases* 36 Record 236–37 (1981). *See generally* Edward G. Burg, *Meeting the Challenge: Rethinking Judicial Qualification,* 69 Cal.L.Rev. 1445, 1470–80 (1981); Alan J. Chaset, *Disqualification of Judges By Peremptory Challenge,* 1981 Fed.Jud.Ctr. 41–53; Gary L. Karl, *Disqualification of Federal District Court Judges for Bias or Prejudice: Problems, Problematic Proposals, and a Proposed Procedure,* 46 Alb. L.Rev. 229, 238–41 (1981).

The proposal to permit a peremptory challenge of a judge was considered by the judges of the Eastern District of New York in a formal meeting. They rejected it. In 1981 The Committee on Federal Courts of the Association of the Bar of the City of New York proposed the adoption of a court rule allowing peremptory challenges of judges for the Eastern and Southern Districts of New York. The Committee, with few dissenters, proposed experimenting with the procedure, reasoning *inter alia,* that such a procedure would give litigants a sense that they had been treated fairly by the courts. *Committee Report: A Proposal for Peremptory Challenges of Federal Judges in Civil and Criminal Cases,* 36 Record 238 (1981). For a critique of the proposal *see,* John R. Bartels, *Peremptory Challenges to Federal Judges: A Judge's View,* 68 A.B.A.J 449, 451 (1982).

The present Guidelines for division of judicial business which were adopted by the Board of Judges of the United States District Court for the Eastern District of New York were an outgrowth of the work of the

Court's Criminal Procedure Committee, which was appointed in the Fall of 1985. The Committee was charged by the then chief judge with conducting a study of the manner in which criminal cases were assigned to judges in light of an increasing number of large cases in the District. As part of its study the Committee considered modification of the related case rule, reassignment of the arraignment function and issues concerning pretrial case management. *See* Reports of the Criminal Procedure Committee, 111 F.R.D. 303 and 311 (1986). The comprehensive guidelines and history of this subject which involved a number of years of work by the Court's Criminal Procedure Committee and public discussion at a number of meetings of the bench and bar, as well as a thorough consideration by the Board of Judges of proposals to admit a routine challenge of the judge by the defendant, makes it clear that, in cases generally, a defendant's motion to peremptorily challenge a judge assigned to the case would have to be denied in the Eastern District of New York.

## IV. CAPITAL PUNISHMENT

The question posed, however, is whether when the possible punishment is death, the general rule should be modified? It is well accepted by those who have dealt with capital cases that the possibility of capital punishment may substantially distort trials and that special precautions are required in such cases. Not only is this important for the perceptions of the public, but also for those of the defendant, who must have assurance that full due process was rendered by an impartial tribunal.

For the state to kill a defendant using procedures which might have been tainted, or seem to have been tainted, by prejudice is not acceptable in a constitutional democracy such as ours. In addition to the serious moral problems posed by the state sanctioning the deliberate killing of human beings, many involved in the process have experience as litigators and are aware of the risks of error in executing innocent persons. They are cognizant, too, of the lack of statistical proof that capital punishment provides any substantial deterrence and of the likelihood that imposition will be substantially higher against some ethnic groups.

The practice of those who must impose sentences of death to avoid such penalties where possible is long standing. " 'A Sanhedrin that execute[d] capital punishment ... even once in seventy years' " was considered tyrannical. Hyman E. Goldin, *Hebrew Criminal Law and Procedure* 25 (1952) (citations omitted).

These concerns have led to the establishment of many procedural safeguards in capital cases. The method of jury selection is particularly meticulous where the death penalty may be imposed. In federal cases, for example, both the government and the defendant are permitted twenty peremptory challenges as contrasted with ten or fewer when a less serious punishment is at stake. F.R.Cr.P. 24. This expanded challenge procedure, designed to ensure that the jury is not tainted with opinions regarding capital punishment that would prevent it from rendering an impartial verdict, is reserved only for capital cases. *United States v. Vallez*, 653 F.2d 403 (9th Cir.), *cert. denied sub nom. Molina v. United States*, 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981). Failure to permit the defendant the requisite number of challenges constitutes reversible error. *Amsler v. United States*, 381 F.2d 37 (9th Cir.1967). An analysis of state criminal statutes reveals a considerably higher average number of peremptory challenges available to both the prosecution and defense for capital cases than for lesser felonies. Brent J. Gurney, Note, *The Case For Abolishing Peremptory Challenges in Criminal Trials*, 21 Harv.C.R.–C.L.L.Rev. 227, 228 (1986).

The federal rules also mandate that defendants in capital cases be furnished with the names and addresses of all prospective jurors and prosecution witnesses at least three days before the trial begins. 18 U.S.C. § 3432. The procedure is limited only to cases where the death penalty is sought. *United States v. Shakur*, 623 F.Supp. 1 (S.D.N.Y.1983).

The seriousness with which these matters are treated is typified by the long and

tortured history in the Supreme Court of how jurors are to be selected in capital cases and how their attitude toward capital punishment is to be evaluated. The Court limited the states' power to exclude jurors in such cases by rejecting attempts by a trial court to exclude all jurors who expressed philosophical or religious opposition to capital punishment since such a jury would constitute a "tribunal organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, *reh'g denied*, 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968). Nor may courts purge a jury of individuals whose deliberations may be affected by the knowledge that the death penalty is a possibility. *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980) (exclusion proper only when the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath").

The Court clarified its holdings in *Witherspoon* and *Adams* and reaffirmed the *Adams* test for examining jurors views on capital punishment. It acknowledged that the mere fact that a juror's bias regarding the death penalty could not be determined with "unmistakable clarity" was not grounds to exclude, noting that the *voir dire* procedure may be inadequate to fully ascertain the true nature of a potential juror's feelings on the subject. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). It is not sufficient merely to ask jurors if they would follow the law in the particular case. Rather, the trial court, upon defendant's request, must specifically inquire of each prospective juror whether he or she would automatically impose the death penalty so that the defendant can intelligently exercise a challenge for cause. *Morgan v. Illinois*, — U.S. —, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

Rules of evidence are generally more stringently applied to favor defendants in capital cases. The judge may exclude evidence that otherwise would be admissible. The great seriousness with which the case is conducted and the nature of the charge after the verdict of guilt during the capital punishment phase requires a charge that may have a substantial impact on whether the jury finds guilt and imposes death as a penalty. The law is narrowly construed by many trial and appellate judges, both substantively and procedurally, to reduce the possibility of the death penalty.

The court must have in mind the possibility of a miscarriage of justice. Once the sentence is carried out, it is not reversible. When the New York Court of Appeals was reviewing capital cases, it was the practice of each judge to comb the record for any possible basis for reversal not raised by the parties. *See, e.g., People v. Wood*, 12 N.Y.2d 69, 78, 236 N.Y.S.2d 44, 187 N.E.2d 116 (1962) (Fuld, J., dissenting) (in capital case, objection need not be raised to preserve for review on appeal); *People v. Miller*, 6 N.Y.2d 152, 154, 188 N.Y.S.2d 534, 160 N.E.2d 74 (1959) (in capital case, court can review issues concerning sufficiency and weight of evidence to support conviction even if not properly raised); *People v. Hetenyi*, 304 N.Y. 80, 94, 106 N.E.2d 20 (1952) (procedure for review of capital cases not dependent on noted exceptions and objections); *People v. Crum*, 272 N.Y. 348, 350, 6 N.E.2d 51 (1936) (in capital cases only, court is empowered to review both questions of fact and law).

The Supreme Court's acknowledgement of the special nature of capital punishment has resulted in a long line of modern capital punishment decisions beginning in the late 1970s dealing with the procedural safeguards required of states in capital cases. After having virtually invalidated every death penalty statute in the nation in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, *reh'g denied*, 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972), the Court gradually began to sanction the death penalty provided it was not imposed in an arbitrary and capricious manner. While the Court made clear that there was no single way to implement a capital sentencing scheme, the Court approved a bifurcated proceeding, as suggested by an early version of the Model Penal Code. It provided the sentencing authority with "information relevant to the imposition of sen-

tence and standards to guide its use of the information." *Gregg v. Georgia,* 428 U.S. 153, 194–95, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976).

The cases which followed have resulted in what has been described as a tension between two competing views in the capital sentencing doctrine—one which requires guided discretion on the part of the sentencer and another which forbids constraints on the sentencer's discretion to decline to impose the death penalty. *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511, *reh'g denied,* 497 U.S. 1050, 111 S.Ct. 14, 111 L.Ed.2d 828 (1990) (Scalia, J., concurring); *see also Sochor v. Florida,* 112 S.Ct. 2114, 2130 (1992) (Scalia, J., concurring, referring to the Court's death penalty jurisprudence as being of "byzantine complexity"); *see generally* Scott W. Howe, *Resolving the Conflict in the Capital Sentencing Case: A Desert–Oriented Theory of Regulation,* 26 Ga.L.Rev. 323 (1992). Most state death penalty statutes incorporate some procedure for jurors to inquire into the circumstances surrounding the particular case before imposing the death penalty. *See, e.g.,* 42 Pa.Cons.Stat.Ann. § 9711 (Purdon 1982 & Supp.1992); N.J.Stat.Ann. § 2C:11–3 (West Supp.1992); *See generally* Stephen Gillers, *Deciding Who Dies,* 129 U.Pa. L.Rev. 1 (1980).

The difficulty inherent in drafting capital sentencing guidelines which can be understood and fairly applied has been characterized as a "task[ ] ... beyond present human ability." Patrick E. Higginbotham, *Colloquy: Juries and the Death Penalty,* 41 Case W.Res.L.Rev. 1047, 1055 (1991). Recently, a study which revealed such juror misunderstanding resulted in a death sentence being vacated with the possibility of a similar result for other death-row inmates. *United States ex rel. Free v. McGinnis,* 1992 U.S.Dist. Lexis 10321 (N.D.Ill., July 7, 1992) (based on juror comprehension studies of the late distinguished professor Hans Zeisel).

The statute under which the defendant is being prosecuted contains the prescribed penalty phase provisions which afford him the special safeguards mandated by the Court. The government is required to file a notice that it intends to seek the death penalty and must enumerate the aggravating factors it will seek to prove as the basis for the death penalty. These factors, which the government must prove beyond a reasonable doubt may include, but are not limited to the defendant's prior criminal convictions involving the infliction of serious injury upon another, whether the offense was committed in exchange for payment, the extent of planning and premeditation involved, the vulnerability of the victim and whether the offense was committed in a particularly heinous manner. 21 U.S.C. § 848(n)(12). The judge is then required to conduct a separate hearing with a jury, to determine the punishment to be imposed. *Id.* § 848(i). The defense is entitled to offer proof of any mitigating factors that should be considered in imposing sentence. *Id.* § 848(j). The jury must then consider all the evidence presented and unanimously reach special findings regarding any aggravating factors which may be found to exist. Applying a balancing test, the jury then decides whether the death sentence should be imposed. *Id.* § 848(k).

▮ While there appears to be no precedent on the point, given the heavy weight of special protection in capital cases, the defendant should have the right to strike the first judge assigned to the case without giving any reason. This peremptory challenge, as a practical matter, needs to be limited to one challenge. The judge thereafter selected, using the normal practice of the court, will be the one assigned subject only to the usual recusal or other appropriate motions.

## V. ASSIGNMENT OF JUDGE

▮ The government requested the clerk of the court to assign the case as a related case. Rule 50.3 of the Guidelines for the Division of Business, United States District Court, Eastern District of New York is relevant. It provides for the assignment of related cases to the same judge in the interest of judicial economy. Section (a) provides a general definition of "related"

cases. Section (c) contains specific limiting provisions for evaluating whether criminal cases are "related." The issue is how the two provisions of the Rule interact.

Rule 50.3 states in relevant part:

(a) *"Related" case defined.* A case is "related" to another for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate ...

(c) *Criminal cases.* Criminal cases are "related" only when (A) a superseding indictment or information is filed, or (B) more than one indictment or information is filed against the same defendant or defendants, or (C) when an application is filed by a person in custody that related to a prior action. Other cases will be deemed "related" only upon application by a party, upon notice, to the judge presiding over the earlier assigned case. The application will be granted if a substantial slaving of judicial resources is likely to result from assigning both cases to the same judge ...

(f) *Case erroneously assigned as related.* The designation of cases as related may be corrected *sua sponte* by the judge to whom they are assigned, by returning to the clerk for reassignment cases erroneously so assigned ...

Defendant argues that under Rule 50.3(a) this case and the prior proceeding do not meet the criteria for consideration as related cases. He claims that the current violations relating to narcotics importation, racketeering, engaging in a continual criminal enterprise and terrorism do not resemble, in law or fact, the previous false statement and false identification charge.

The government contends that principles of statutory construction require the court to construe the general language of 50.3(a) in a manner consistent with the specific criminal section (50.3(c)). Since 50.3(c) does not require that the cases be factually related, it argues, whenever there is more than one indictment brought against the same defendant, the indictment should be assigned to the same judge.

The language of the Rule as well as its legislative history reveals that the instant proceeding and the prior one are not related cases. Section (a) provides the threshold definition for related cases in general. For cases to be related, they must stem from a common transaction or contain similar facts or legal issues. Unless this threshold test is met, the cases, by definition, are not "related."

It is only after the court determines that the threshold test has been satisfied, that it then can look to the specific requirements for criminal cases. Both (a) and (c) must be satisfied if a criminal case is to be deemed related. Section (c) was developed by the judges of the court after long debate to ensure that the United States Attorney did not use the government's superior knowledge to put the case before a judge it selected. It is intended as a limitation on cases that qualify under Section (a). A criminal case can "only" be related under Section (a) if it fits within one of the illustrative examples in Section (c). With regard to the applicable provision, here 50.3(c)(B) (cases involving the same defendant), even if the facts and issues are the same, the cases are not related if the defendants are different. By a parity of reasoning multiple cases involving the same defendant, absent similarity of facts or issues, are not related.

The government challenges defendant's assertion that the two proceedings contain no similarity of facts or legal issues. It relies on this court's familiarity with the defendant's background and the fact that both cases stem from defendant's activities as a member of the Medellin Drug Cartel.

The prior proceeding against this defendant for false statements involved facts, issues and law that are wholly unrelated to the instant action. The court's familiarity with defendant's background, however slight, does not render the cases related. No savings of judicial time will result from treating these cases as related cases.

The identity of defendants, without more, does not bring the cases within the

Rule. Even were this court to deny defendant's motion to strike, this case would have to be returned to the Clerk for reassignment since its original assignment as a related case violated Rule 50.3.

## VI. THE GOVERNMENT'S OPTION TO CHALLENGE

In the recent development of law limiting the government's right to peremptorily challenge jurors on the basis of race, sex or other non-relevant criteria, the Supreme Court has dealt with the right of the defendant to limit such prejudices. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (barring prosecution from employing peremptory challenges solely on the basis of race); *Powers v. Ohio,* — U.S. —, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (allowing defendant to object to prosecutor's race-based peremptory challenge whether or not excluded jurors share same race); *Georgia v. McCollum,* — U.S. —, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (barring defendant from using peremptory challenges to engage in racial discrimination).

Other courts have begun to develop a corollary rule designed to prevent defendants from challenging for reasons not acceptable under the Constitution. *See e.g., United States v. Greer,* 968 F.2d 433 (5th Cir.1992) (denying defendant's request that court strike all prospective black, hispanic and Jewish jurors where those groups were intended victims of offenses charged); *United States v. DeGross,* 960 F.2d 1433, 1422 (9th Cir.1992) (disallowing female defendant's use of peremptory challenge against male juror, absent neutral justification, where she had already used seven of eight challenges against males); *United States v. Nururdin,* 794 F.Supp. 277, 281 (N.D.Ill.1992) (refusing to allow defendants to challenge for cause jurors with connections to law enforcement without showing of bias or prejudice).

We need not now decide whether, as a corollary to the peremptory right of the defendant to challenge the judge in a capital case, the government should have that right. That issue is not now posed.

## CONCLUSION

The motion to place the case back in the wheel for selection of another judge is granted. The clerk of the court will choose by random selection a judge of the court pursuant to the Guidelines for the Division of Business. The clerk is directed to notify the defense and government counsel of the time when the judge's name will be chosen and to notify the press so that the impartiality of the process of assigning judges can be publicly observed in a capital case.

SO ORDERED.